PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EDWARD YASHENKO,
            *Plaintiff-Appellant,*

v.

HARRAH'S NC CASINO COMPANY,
LLC,
            *Defendant-Appellee.*

$\left.\rule{0pt}{6em}\right\}$  No. 05-1256

Appeal from the United States District Court
for the Western District of North Carolina, at Bryson City.
Lacy H. Thornburg, District Judge.
(CA-03-226-2)

Argued: March 15, 2006

Decided: April 27, 2006

Before MOTZ and TRAXLER, Circuit Judges,
and James P. JONES, Chief United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Traxler and Judge Jones joined.

_____

## COUNSEL

**ARGUED:** Michael Geoffrey Wimer, WIMER & JOBE, Arden,
North Carolina, for Appellant. Jeffrey Andrew Lehrer, FORD &
HARRISON, L.L.P., Spartanburg, South Carolina, for Appellee. **ON
BRIEF:** Karen M. Tyner, FORD & HARRISON, L.L.P., Spartan-
burg, South Carolina, for Appellee.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This case presents two questions of first impression for this circuit. First, does the Family and Medical Leave Act ("FMLA"), 29 U.S.C.A. § 2601 *et seq.* (West 1999 & Supp. 2005), provide a covered employee with an absolute right to be restored to his previous job after taking approved leave? And second, is a private employer that contracts with an Indian tribe subject to suit for race discrimination under 42 U.S.C.A. § 1981 (West 2003) when it enforces a contractual tribal preference policy? For the reasons that follow, we believe we must answer both questions in the negative and so affirm the judgment of the district court.

I.

In June 1996, the Eastern Band of Cherokee Indians ("Tribe") entered into a Management Agreement with Harrah's North Carolina Casino Company ("Harrah's") concerning the operations of the Tribe's gaming enterprise. Under the terms of the Agreement, the Tribe granted Harrah's "the exclusive right and obligation to develop, manage, operate and maintain the Enterprise and any expansion thereof." The Tribe delegated its own "obligations and rights under this Agreement" to the Tribal Casino Gaming Enterprise ("TCGE"), an "instrumentality of the Tribe" with authority to conduct the business of the casino on behalf of the Tribe. The Agreement thus functioned as an employment contract under which Harrah's worked as the manager for the Tribe's delegate, the TCGE. Through this arrangement, Harrah's provided its "experience and expertise" in managing the gaming operation and training the tribal members.

As part of this Management Agreement, Harrah's received "the exclusive responsibility and authority to direct the selection, hiring, training, control and discharge of all employees performing regular services for the Enterprise in connection with the maintenance, operation, and management of the Enterprise and the Facility and any activity upon the Property." The Agreement provided that Harrah's would "give preference in recruiting, training and employment to qualified members of the Tribe and their spouses and adult children in all job

categories of the Enterprise." Accordingly, Harrah's assented to the following order of preference: "(a) Enrolled Tribal members; (b) Spouse, parent or children of Tribal members; (c) Other Native Americans; (d) Others from the Cherokee community; (e) Others from the region; and (f) Others from the state of North Carolina."

All employees hired by Harrah's to staff the casino pursuant to this Agreement were considered employees of the TCGE, although Harrah's maintained supervisory authority over them. Harrah's and TCGE classified many of these employees as "leased" employees; leased employees worked at the casino, Harrah's paid their salaries and benefits, and TCGE reimbursed Harrah's for these expenses. In the years after the Agreement went into effect, there was a gradual shift in positions from Harrah's to the TCGE. By 2003, all employees that Harrah's hired were TCGE, rather than Harrah's, employees.

In 1994, Harrah's hired Edward Yashenko to work for the parent company in Louisiana; in 1997, he transferred to the North Carolina casino, where he became a "leased" employee. In 1999, Yashenko received a promotion to the position of Manager - Employee Relations, a job he held until his discharge in July 2003. During his tenure at the North Carolina casino, Yashenko requested and was granted several medical leaves of absence, all of which were approved and most of which were taken under the FMLA. Specifically, Yashenko received approximately ten weeks leave from December 19, 2000, until February 26, 2001; approximately fifteen weeks leave from May 1 until August 23, 2001; six weeks leave from March 13 until April 23, 2002; and fourteen weeks leave from May 1 until August 12, 2002. After each leave of absence, Yashenko returned to the same job, with no reduction in pay or benefits.

In early May 2003, Yashenko requested another medical leave of absence for a serious health problem related to heart surgery. Harrah's approved the leave as FMLA leave, and Yashenko remained on leave for eleven more weeks, until July 21, 2003. While Yashenko was out, Harrah's informed him that the company was reorganizing in a way that eliminated his position (a Harrah's position), as well as the position of Employment Manager (a TCGE position). In their stead, Harrah's created two new TCGE positions that consolidated the responsibilities of the eliminated jobs. The company's goal was to

form "a synergy . . . by having . . . one manager responsible for the life of the employee from hiring to termination." Tom Fagg, the Human Resources director at Harrah's, invited Yashenko to apply for the new positions, as well as other available TCGE jobs. (There were no available jobs at Harrah's because the Agreement "prevented [Harrah's] from hiring new employees to work for Harrah's.") Despite the invitation and the many descriptions of job openings Fagg sent him, Yashenko decided not to apply for any position because, he explained, he was taking medication, and did not feel up to it, and because his doctors assertedly recommended that he not do so. Upon his return from FMLA leave on July 21, 2003, Harrah's discharged him.

Yashenko then filed suit in state court against Harrah's alleging violations of his rights under the FMLA because Harrah's did not restore him to his job at the end of his leave. Harrah's removed the case to federal court. After both parties moved for summary judgment, the district court granted Yashenko permission to file an amended complaint in which he added claims of race discrimination under § 1981 and of wrongful discharge in violation of North Carolina public policy. The parties then filed cross motions for summary judgment on these additional claims. On January 20, 2005, the district court granted summary judgment to Harrah's on both the FMLA and § 1981 claims, and dismissed the wrongful discharge claim without prejudice. Yashenko noted a timely appeal.

II.

In recognition of the growth of "single-parent households and two-parent households in which the single parent or both parents work," the importance of parental participation "in early childrearing" and "care of family members who have serious health conditions," the inadequacy of "employment policies to accommodate working parents," and the lack of "job security for employees who have serious health conditions," 29 U.S.C.A. § 2601(a), Congress enacted the Family and Medical Leave Act in 1993. In this legislation, Congress sought "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, . . . to promote national interests in preserving family integrity," and "to entitle employees to take reasonable leave for medical reasons, for

the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." *Id.* § 2601(b)(1)-(2). The legislature sought to "accomplish" these purposes "in a manner that accommodates the legitimate interests of employers." *Id.* § 2601(b)(3).

The FMLA provides covered employees with two types of rights and protections. First, covered employees who take a leave of absence for family or medical reasons qualify for numerous substantive entitlements. Specifically, these employees are "entitled to a total of 12 workweeks of leave during any 12-month period" for family- and health-related matters, *id.* § 2612(a)(1), and have a right "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1)(A)-(B). Leave taken under the FMLA "shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." *Id.* § 2614(a)(2). However, a restored employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." *Id.* § 2614(a)(3)(B).

These substantive rights, and their accompanying protections, *see id.* § 2615(a)(1), are *prescriptive*, "set[ting] substantive floors for conduct by employers, and creating entitlements for employees." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998) (quoting *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 712-13 (7th Cir. 1997))(internal quotation marks omitted) (amendment in original). *See also Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000) (explaining that "in §§ 2612-2615, the Act contains prescriptive protections for employees that are expressed as substantive statutory rights"). Claims of alleged violations of these prescriptive rights — known as "interference" or "entitlement" claims — arise under 29 U.S.C.A. § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

In addition to these prescriptive rights and protections, the Act also contains *proscriptive* provisions that protect employees from discrim-

ination or retaliation for exercising their substantive rights under the FMLA. *See Hodgens*, 144 F.3d at 159-60; *Rice*, 209 F.3d at 1017. Known as "retaliation" or "discrimination" claims, causes of action alleging violations of these proscriptive rights arise under 29 U.S.C.A. § 2615(a)(2), which states that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

Yashenko asserts that Harrah's violated both his prescriptive and proscriptive FMLA rights. We address each claim in turn.

## A.

Yashenko principally contends that Harrah's interfered with the exercise of his FMLA rights when, after he took his most recent leave, it refused to restore him to his previous employment position. He offers a legal and a factual argument in support of this contention.

## 1.

First, Yashenko maintains that § 2614(a)(1) creates an absolute entitlement to restoration. This section provides that any person who takes FMLA leave

> shall be entitled, on return from such leave — (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C.A. § 2614(a)(1). However, 29 U.S.C.A. § 2614(a)(3)(B) contains limitations providing that "nothing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."

Every other circuit to consider an argument like Yashenko's has concluded that § 2614(a) of the FMLA provides an employee only a limited right to restoration to his previous employment position. In particular, an employer can avoid liability under the FMLA if it can prove that it "would not have retained an employee had the employee not been on FMLA leave." *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005). *See also Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 245 (6th Cir. 2004); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 148 (3d Cir. 2004); *McBride v. Citgo Petroleum Corp.*, 281 F.3d 1099, 1108 (10th Cir. 2002); *Rice*, 209 F.3d at 1018; *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1354 (11th Cir. 2000).

We join our sister circuits in concluding that the FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave. Although the statutory language is ambiguous on this point, the Secretary of Labor has promulgated a regulation — 29 C.F.R. § 825.216 (2005) — clearly resolving the question.

Yashenko argues that this regulation is contrary to the plain language of the statute, which he maintains unambiguously entitles every employee returning from FMLA leave to restoration to his prior job. Emphasizing the phrase "restored employee" in § 2614(a)(3), Yashenko contends that this limitation on FMLA rights applies only *after* an employee who has been on leave has been "restored" to his previous employment position; according to Yashenko, the statutory limitation in § 2614(a)(3)(B) does not provide a basis for refusing to restore an employee in the first place. Thus, Yashenko argues that the FMLA provides (in § 2614(a)(1)) an absolute right to restoration, with limitations (in § 2614(a)(3)) only on "a restored employee's entitlement to seniority and other benefits accruing during the leave." Brief of Appellant at 13.

We do not find Yashenko's plain language argument persuasive. Yashenko's reading of § 2614(a)(3)(B) — confining its limitation to employees who have been restored to their previous position of employment — ignores the broad statutory command that "[n]othing" in § 2614 entitles a restored employee to "any . . . position of employment" to which he would not have been entitled "had the employee

not taken the leave." 29 U.S.C.A. § 2614(a)(3)(B). Yashenko's failure to consider this statutory command is particularly significant because the plain language of this command clearly contradicts the meaning he ascribes to the phrase "restored employee." For example, under Yashenko's reading, when a poorly performing employee takes FMLA leave before his employer can discharge him, the employer must restore this employee to his prior position upon completion of the leave. However, that very restoration gives the employee — in violation of § 2614(a)(3)(B) — a benefit (the "position of employment") to which he would not have been entitled absent the leave.

Furthermore, Yashenko's interpretation could lead to anomalous results that we find it unlikely Congress would have intended. For instance, an employer who eliminated an entire branch of the business while a covered employee was on leave would, according to Yashenko, be required to retain that employee and restore him to a nonexistent position when he returned to work. Such an unqualified entitlement to restoration would give employees on FMLA leave greater rights than those provided to employees not on leave, upsetting the careful balance that Congress has created between employees' need for protected family and medical leave and employers' need to protect their legitimate business interests — an outcome wholly inconsistent with the purposes and goals of the FMLA.

Accordingly, Yashenko's plain language argument fails; it does, however, suggest an ambiguity in the FMLA that precludes reliance on the language of the statute to resolve the question before us. When a statute is ambiguous, we do not "simply impose [our] own construction on the statute," but rather look to the regulations promulgated pursuant to the legislation to see whether they provide "a permissible construction of the statute." *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). *See also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002).

In this case, the Secretary of Labor has promulgated a regulation, 29 C.F.R. § 825.216, that addresses the precise question at issue: whether there are "limitations on an employer's obligation to reinstate an employee." The regulation answers this question in the affirmative, explaining that

> [a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.

*Id.* § 825.216(a). Thus, under the Secretary's construction of the FMLA, the Act does not create an absolute right to restoration to a previous employment position; rather, an employer may deny restoration when it can show that it would have discharged the employee in any event regardless of the leave.

We must defer "to an executive department's construction of a statutory scheme it is entrusted to administer"; we "may not substitute [our] own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844. Considering § 825.216(a) in conjunction with the entire statutory scheme Congress has enacted, clearly the construction adopted by the Secretary of Labor reflects a reasonable interpretation of § 2614(a)(3)(B). Construing § 2614(a)(3)(B) as qualifying the right to restoration for all employees taking FMLA leave, the Secretary avoids the anomalous results that would arise under an absolute entitlement scheme. And the Secretary's construction, unlike Yashenko's, is entirely compatible with Congress's efforts to pursue the goals of the FMLA in a manner that "accommodates the legitimate interests of employers." 29 U.S.C.A. § 2601(b)(3). For these reasons, we find § 825.216 to be a reasonable construction of the FMLA ,and we defer to the Secretary of Labor's interpretation of § 2614(a).[1] We therefore

---

[1] Our standard of review of the validity an agency's regulation "depends upon whether such regulation is legislative or interpretive." *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 452 (4th Cir. 2004). We review legislative regulations (those filling explicit gaps in the statute) to ensure they are not "arbitrary, capricious, or manifestly contrary to the statute," while reviewing interpretive regulations (those clarifying terms and provisions of the statute) for reasonableness. *Chevron*, 467 U.S. at 844. We need not decide whether 29 C.F.R. § 825.216 is interpretive or legislative because, by finding it to be a reasonable interpretation of the statute, it necessarily follows that it is not arbitrary, capricious, or manifestly contrary to the statute.

hold that the FMLA provides no absolute right to restoration to a prior employment position.

2.

Yashenko alternatively maintains that, even if there is no absolute right to restoration, Harrah's interfered with his FMLA rights because its purported reasons for eliminating his position lacked legitimacy. In response, Harrah's contends that it eliminated Yashenko's position for legitimate reasons unrelated to his request for leave, and that it therefore had no obligation to restore Yashenko because he would have lost his job even if he had not taken leave.

To avoid liability on an interference claim, an employer that denies restoration to an employee returning from FMLA leave "must be able to show that [the] employee would not otherwise have been employed at the time reinstatement is requested." 29 C.F.R. § 825.216(a). Although this regulation clearly places a burden on the employer to come forward with evidence that it would have discharged the employee whether or not he took FMLA leave, the circuits disagree as to who bears the ultimate burden of proof on this matter. *Compare Rice*, 209 F.3d at 1018 (ultimate burden falls on employee), *with Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 963 (10th Cir. 2002) (employer has the ultimate burden). We have held that to proceed on an interference claim asserting a violation of substantive rights under the FMLA, an employee bears the burden of proof in establishing that he is entitled to the benefit at issue under the statute, *Rhoads v. FDIC*, 257 F.3d 373, 384 (4th Cir. 2001), but we have not yet resolved the question of whether, in a case where the employee alleges interference with his right to restoration, the explicit language in § 825.216(a) validly shifts the ultimate burden of proof to the employer to establish the limitations on its obligation to restore the employee. However, we need not resolve that issue here because, regardless of who bears the ultimate burden of proof, Yashenko's claim cannot succeed.

In support of his argument that Harrah's interfered with his FMLA rights, Yashenko offered only the following: that Yashenko's job was not in jeopardy when his leave commenced in May 2003; that Yashenko received a grade increase in March 2003 shortly before the

leave began; that Yashenko was the only employee who lost his job after his position was eliminated by the reorganization in 2003; that Harrah's had never required anyone else on a leave of absence to apply or interview for a position; and that even if Yashenko had applied for the newly created Manager position, he would not have gotten the job.

None of this evidence puts into dispute the company's contention that Yashenko's position was eliminated in a legitimate reorganization. For example, since there is nothing in the record that indicates that the elimination of the position had anything to do with Yashenko's job performance, the statement that his job was not in jeopardy when he went out on FMLA leave is irrelevant, as is the fact that Yashenko received a grade increase in March 2003. Similarly, although it is undisputed that Yashenko was the only employee who did not have a job after the reorganization, it is also undisputed that he did not apply for any jobs, despite Harrah's application requirements and its numerous invitations to him to apply. That Harrah's would not have hired Yashenko to fill the newly created Manager position had he applied does not discredit Harrah's account of its reasons for discharging Yashenko; Yashenko chose not to apply for *any* of the numerous open positions, despite suggestions that he apply. And finally, while Harrah's had never before required anyone to apply or interview for a position while on FMLA leave, there is no evidence in the record of any situation that necessitated Harrah's doing so in the past. Thus, even accepting Yashenko's evidence and drawing all inferences in his favor, a reasonable jury could not on this evidence find for him.

An additional problem with Yashenko's evidence is that it does not refute the evidence submitted by Harrah's demonstrating that its reorganization was legitimate and that it would have discharged Yashenko even if he had not taken leave. Harrah's evidence — including affidavits, deposition testimony, internal memos, emails, letters, and other documents — established the following undisputed facts: that in September 2002, before Yashenko requested this most recent leave, the finance department had suggested a reorganization that would eliminate Yashenko's position; that Harrah's had approved FMLA leave for Yashenko on several previous occasions and that, after each leave, Yashenko had returned to the same position at the same salary

and benefits; that during Tom Fagg's tenure as Harrah's Human Resources Director, Harrah's restructured the department at least three times to better align itself with other Harrah's facilities, eliminating "12 positions at least"; that there was a general shift in employment positions from Harrah's to the TCGE; that Harrah's had eliminated, transferred, or consolidated several other positions; that Harrah's encouraged Yashenko to apply for both of the newly created positions, as well as for all other available TCGE positions, but that Yashenko did not apply for any of them; and that Harrah's continued to provide Yashenko with benefits until he had completed his leave. Harrah's also offered uncontroverted deposition testimony that Tom Fagg and Harrah's General Manager made the decision to reorganize in approximately March 2003, two months prior to Yashenko's request for leave, and that they timed the reorganization to coincide with Fagg's leaving Harrah's on June 30, 2003.

Given these facts, the district court certainly did not err in granting summary judgment to Harrah's on Yashenko's interference claim.

B.

In addition to claiming an interference with his FMLA rights, Yashenko contends that Harrah's retaliated against him for taking protected leave. FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973). *See Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001). Thus, to succeed on his retaliation claim, Yashenko must first make a prima facie showing "that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). If he "puts forth sufficient evidence to establish a prima facie case of retaliation" and Harrah's "offers a non-discriminatory explanation" for his termination, Yashenko "bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." *Nichols*, 251 F.3d at 502.

It is undisputed here that Yashenko engaged in a protected activity (taking FMLA leave) and that he experienced an adverse employment

action (termination). Thus, to establish his prima facie case, Yashenko must demonstrate that there was a causal connection between his taking leave and his termination. To satisfy this showing, Yashenko offers evidence of the temporal proximity between his absence and the elimination of his job. While evidence as to the closeness in time "far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). Hence, Yashenko has made a prima facie showing of retaliation.

Nevertheless, Yashenko's retaliation claim fails because he has not proffered evidence demonstrating that Harrah's asserted legitimate non-discriminatory reason for eliminating his position was pretextual. As discussed above in reference to Yashenko's interference claim, Harrah's offered a great deal of evidence explaining its reasons for eliminating Yashenko's position, none of which relate to his FMLA leave. Harrah's submitted substantial evidence that it had considered the elimination of Yashenko's position several months prior to his request for leave, that its Human Resources department had been implementing a general reorganization under the leadership of Tom Fagg and that it had eliminated several other positions in the process, and that there was an overall shift in jobs from Harrah's to TCGE, consistent with the Management Agreement between Harrah's and the Tribe. This evidence satisfies Harrah's burden of proving that it had legitimate non-discriminatory reasons for Yashenko's discharge unrelated to his FMLA leave. In his attempt to show pretext, Yashenko offered only evidence that is entirely consistent with Harrah's reorganization plan. As discussed above, his evidence does not create a genuine issue of material fact concerning the legitimacy of the restructuring sufficient to survive summary judgment. We therefore affirm the district court's grant of summary judgment to Harrah's on Yashenko's retaliation claim.

III.

Along with his allegations of violations under the FMLA, Yashenko asserts that Harrah's tribal preference policy violated his rights under 42 U.S.C.A. § 1981, which prohibits discrimination in employ-

ment on the basis of race.[2] The fundamental problem with this argument is that, due to the Management Agreement between Harrah's and the Tribe, Yashenko cannot assert a § 1981 claim against Harrah's unless he joins the Tribe as a party to the lawsuit, and the Tribe enjoys sovereign immunity from suit. *See Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 753-55 (1998).

Under Rule 19 of the Federal Rules of Civil Procedure, a person or party must be joined in an action when

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a). If joinder is not feasible, a court must decide whether "the action should proceed among the parties before it, or should be dismissed" because the absent party is indispensable. Fed. R. Civ. P. 19(b). To make this determination, a court must decide:

---

[2]In examining this question, the district court concluded that, although § 1981 does not expressly contain an exemption for Indian preferences, the exemptions contained in 42 U.S.C.A. §§ 2000e(b) and 2000e-2(i) (West 2003) should apply because:

> it would be contrary to Congress' expressed will to allow a plaintiff to circumvent the express provisions of Title VII and assert a[n] employment discrimination claim against an Indian tribe or private business on an Indian reservation for the use of tribal preferences merely by reconfiguring the claim as one for relief under § 1981 instead of Title VII.

*Yashenko v. Harrah's NC Casino Co., LLC*, 352 F. Supp. 2d 653, 663 (W.D.N.C. 2005). The court therefore found that Yashenko's § 1981 claim was barred and granted summary judgment to Harrah's on this issue. Given our resolution of this case, we need not address this issue. *See, e.g.*, *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005).

first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

*Id.*

With these principles in mind, we turn to Yashenko's § 1981 claim. In analyzing whether the Tribe is both a necessary and an indispensable party to Yashenko's lawsuit against Harrah's, we find persuasive a recent Ninth Circuit case that presents facts materially indistinguishable from those at issue here. *See Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150 (9th Cir. 2002).[3]

Like Yashenko, Harold Dawavendewa alleged employment discrimination by a private party that had contracted with an Indian tribe to observe a tribal preference policy on Indian lands. The Ninth Circuit held that the tribe was a necessary party because the plaintiff could not obtain complete relief without suing the tribe; a judgment in the plaintiff's favor would only bind him and the private employer and would not prevent the tribe from continuing to enforce its tribal preference policy on its own property. *Id.* at 1155-56. Moreover, any judgment on such a claim would threaten "to impair the [Tribe]'s contractual interests, and thus, its fundamental economic relationship with" the private party, as well as "its sovereign capacity to negotiate contracts and, in general, to govern" the reservation. *Id.* at 1157. Exactly the same conclusions must be reached here. Additionally, "[a]ny disposition in the [Tribe]'s absence threatens to leave [Harrah's] subject to substantial risk of incurring multiple or inconsistent obligations." *Id.* at 1157. Accordingly, under Rule 19(a), the Tribe is a necessary party to Yashenko's § 1981 claim.

---

[3]We note that Yashenko has offered no legitimate basis for distinguishing *Dawavendewa* and has failed to present any argument that the Tribe is not a necessary and indispensable party or does not enjoy sovereign immunity.

Although the Tribe is a necessary party, because of its status as a sovereign nation, *Kiowa Tribe*, 523 U.S. at 753-55, the Tribe cannot "feasibly be joined as a party" to the action. *See Dawavendewa*, 276 F.3d at 1159. Thus, we must determine whether it is also indispensable to the § 1981 cause of action.

Applying the Rule 19(b) factors, we can only conclude that the Tribe is also indispensable for reasons similar to those rendering the Tribe a necessary party. First, any judgment on the § 1981 claim would prejudice the Tribe's economic interests in the Management Agreement with Harrah's and its interests as a sovereign in negotiating contracts and governing its reservation. At the same time, any such judgment rendered in the absence of the Tribe would prejudice Harrah's because it would hinder its ability to resolve its contractual obligations with the Tribe. Second, there is no way to shape the relief sought in such a way as to mitigate this prejudice to Harrah's and the Tribe. And third, any judgment entered without joining the Tribe would be inadequate because it would bind only Yashenko and Harrah's; the Tribe would remain free to enforce the tribal preference policy on its reservation and through its contractual relations. *See Dawavendewa*, 276 F.3d at 1161-62. Accordingly, the Tribe is indispensable to this claim. *See id.* at 1162. *See also Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 547-48 (2d Cir. 1991) (finding the Navajo Nation to be a necessary and indispensable party based on its lease agreement with the other named defendants and therefore dismissing the case).

We therefore hold that the Tribe is both a necessary and indispensable party to Yashenko's § 1981 cause of action. Because its sovereign status prohibits its joinder, we affirm the judgment of the district court dismissing this claim.[4]

---

[4]Yashenko also maintains that the district court erred when it dismissed without prejudice his supplemental state wrongful discharge claim after it disposed of his federal claims. Once a district court has dismissed the federal claims in an action, it maintains "wide discretion" to dismiss the supplemental state law claims over which it properly has supplemental jurisdiction. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353-54 (1988). Although Yashenko originally brought suit in state court, he did not assert any state law claims until he was permitted to

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

---

amend his complaint after the case was removed to federal court. Moreover, the three-year statute of limitations on the state law wrongful discharge claim will not expire until July 2006. *See United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 424 F.3d 437, 437 (4th Cir. 2005). Accordingly, we see no basis for finding an abuse of discretion in the district court's decision dismissing this state law claim without prejudice. *See Robles v. City of Fort Wayne*, 113 F.3d 732, 738 (7th Cir. 1997). *Cf. Carnegie-Mellon Univ.*, 484 U.S. at 353-54 ("[A] remand generally be preferable to a dismissal when the statute of limitations on the plaintiff's state-law claims has expired before the federal court has determined that it should relinquish jurisdiction over the case.").