**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-2062**

———————

DOMINIQUE SPATAFORE,

        Plaintiff – Appellant,

    v.

CITY OF CLARKSBURG, an incorporated municipality,

        Defendant – Appellee.

———————

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg.  Thomas S. Kleeh, Chief District Judge.  (1:22-cv-00108-TSK)

———————

Argued:  October 23, 2025                        Decided:  January 7, 2026

———————

Before GREGORY, HARRIS, and RICHARDSON, Circuit Judges.

———————

Affirmed by unpublished opinion.  Judge Gregory wrote the opinion, in which Judge Richardson joined.  Judge Harris wrote a separate opinion concurring in part and dissenting in part.

———————

**ARGUED:**  Natalie Rose Atkinson, ATKINSON & FRAMPTON, PLLC, Charleston, West Virginia, for Appellant.  Tiffany R. Durst, PULLIN, FOWLER, FLANAGAN, BROWN & POE, PLLC, Morgantown, West Virginia, for Appellee.  **ON BRIEF:** John-Mark Atkinson, ATKINSON & FRAMPTON, PLLC, Charleston, West Virginia, for Appellant.  Nathaniel D. Griffith, PULLIN, FOWLER, FLANAGAN, BROWN & POE PLLC, Morgantown, West Virginia, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Plaintiff/Appellant Dominique Spatafore was fired from her position with the City of Clarksburg, West Virginia ("the City") approximately three months after returning from medical leave. In the intervening period, Spatafore violated employee conduct policies by sending workplace complaints to the Mayor's wife and the City Council instead of her supervisors and by posting additional complaints to Facebook. The City pointed to these instances of misconduct when terminating Spatafore's employment. Spatafore brought claims under the Family and Medical Leave Act and the West Virginia Human Rights Act, alleging that she was fired in retaliation for taking medical leave. The district court determined that the record evidence, in the light most favorable to Spatafore, did not present a triable issue of fact concerning whether the City's rationale for firing Spatafore was pretextual. We agree and so affirm.

I.

Spatafore was hired by the City as a Marketing/Community Relations Specialist in 2014. In July 2021, Spatafore notified the City that she intended to take leave under the Family and Medical Leave Act (FMLA) to treat her eating disorder. The City granted her leave request in August, and Spatafore returned to work in September. Upon her return, she was permitted to take longer lunch breaks to accommodate her therapy schedule.

Emails between Spatafore and City Manager Henry Faulk on September 20 indicate that Faulk expected Spatafore to have posted specific social media content and was unhappy that Spatafore was planning to wait until the following day to make the post.

2

On September 27, 2021, Spatafore met with Faulk, the City Manager; John Whitmore, the Director of Economic Development (and Spatafore's then-supervisor); and Desiree Lambert, the Human Resources Coordinator. At the meeting, Spatafore was informed that her recent work performance had been unsatisfactory due to 1) "[l]imited communication regarding use of sick leave and leave of absence[,]" 2) "[f]ailure to complete tasks in a timely manner[,]" and 3) "inconsistent work-flow arising from limited communication." J.A. 590. She was presented with a performance improvement program that outlined expectations for her role, including creating twenty to fifty Facebook posts per week and twenty Instagram posts per week. Spatafore indicated that she thought her new job responsibilities were unreasonable and that she could not fulfill the requirements. However, she was told that if she could not meet these requirements, she would be fired.

During this meeting, Spatafore and the other City employees discussed an open position in the Finance Department as an account clerk. Spatafore applied to and was accepted for the account clerk position, which she began on October 14, 2021. In the new position, Spatafore received the same salary and benefits as in her previous position—with the exception that she no longer received a cell phone stipend, because she was no longer using her personal cell phone for City business—but she considered the new position a demotion because of the lower status associated with it.

Later in October, Spatafore messaged Justine Marino ("Marino"), wife of then-Mayor James Marino ("the Mayor"), with various complaints about Faulk and her new position. Spatafore and Marino were not friends; indeed, Spatafore explained in her deposition that Marino had merely reached out to her on prior occasions to express

3

approval of Spatafore's job performance. Spatafore told Marino that Faulk had threatened to fire her unless she took the account clerk position and that he was a "big bully." J.A. 603–606. Spatafore also complained that Faulk had insisted she wear a polo shirt to work, and she claimed that Faulk frequently yelled at her. Marino forwarded these messages to her husband, the Mayor, who forwarded the messages to Faulk.

On December 12, 2021, Spatafore tested positive for COVID-19 and entered a ten-day quarantine. Since she did not have enough sick leave or vacation time to cover the length of her absence from work, Spatafore was informed by email that she would be on unpaid leave for nearly four days. On December 14, Spatafore responded to this email—cc'ing her then-supervisor Kim Karakiozis, as well as Faulk—to communicate that she found this policy "completely unfortunate and unacceptable." J.A. 609. That same day, Spatafore sent another email to the Mayor, Faulk, Karakiozis, and all members of the City Council, attaching the emails from earlier that day, to inform them of this "regressive" policy. J.A. 610–13. The Employee Handbook provides, as the first step in a grievance procedure, that the employee "must attempt to resolve the problem with his/her immediate supervisor," and then wait ten days before filing a grievance with the department head, and then the City Manager. J.A. 279–80.

In early December, Faulk issued a memorandum clarifying that the Governor's proclamation declaring Christmas Eve and New Year's Eve as state holidays did not apply to City employees. On December 15, the City's Facebook page announced that the City Council had honored City employees with a Christmas luncheon. In response to other

4

comments on this post, one of which mentioned that City employees receive a raise and a bonus every year, Spatafore commented:

> I would hardly call Cost of Living Adjustment a raise. If I remember correctly , it's maybe an extra $5.00 per pay. I have been there 7 years and never received a "raise". I however do appreciate the $200 Christmas bonus.
>
> The employee Christmas party is a nice gesture.  However, I'd much rather be "appreciated" every day at work by being treated with respect by the city manager.
>
> Also- the Governor recently declared Christmas Eve and New Year's Eve as holidays – but the City Manager stated he does not have to follow the governors directives and we will work on Christmas Eve and New Year's Eve.  How's that for appreciation.

J.A. 621 (errors in original).  Marino replied to Spatafore that City employees were getting both Christmas Eve and New Year's Eve off from work, and Spatafore responded to Marino by posting a copy of Faulk's holiday memorandum indicating otherwise.  On December 16, Spatafore commented on another of the City's Facebook posts that announced City Hall would be closed on Christmas Eve.  In her comment, Spatafore again posted Faulk's holiday memorandum and asked whether employees would receive Christmas Eve and New Year's Eve off from work in the future.

Around approximately the same time as her Facebook posts, Spatafore sent another message to Marino complaining about Faulk and about Spatafore's belief that other employees were permitted to work remotely while she was forced to take unpaid sick leave. Marino forwarded these messages to Faulk, who forwarded them to Richard Marsh, the City Attorney, on December 15.

5

That same day, Faulk requested to meet with Marsh, Karakiozis (Spatafore's supervisor), and Lambert (human resources) about Spatafore's employment. They met on December 16 and decided to terminate Spatafore's employment. At the meeting, Faulk raised a concern about firing Spatafore so recently after she had returned from FMLA leave, but he was reassured by Marsh that Spatafore's violation of the handbook provided sufficient cause. On December 19, Marsh drafted a letter outlining the decision to terminate Spatafore, specifically mentioning 1) Spatafore's emails to Marino criticizing the COVID leave policy; 2) Spatafore's email to the City Council, from her official email address, criticizing the City; 3) Spatafore's Facebook posts that criticized the City and shared internal memos; and 4) Spatafore's previous disciplinary infractions for failure to adhere to the dress code. Spatafore was fired on December 20, 2021, for "issues including insubordination, insolence, and unsolicited distribution of internal documents," per the letter she received. J.A. 857.

Spatafore filed suit in West Virginia state court alleging retaliation in violation of the FMLA, disability discrimination in violation of the West Virginia Human Rights Act, a violation of the substantial public policy of West Virginia, and a state-constitutional tort. The City removed the case to the U.S. District Court for the Northern District of West Virginia. After discovery, the district court granted the City's motion for summary judgment on all of Spatafore's claims. On appeal, Spatafore only challenges the district court's determination with respect to her claims of FMLA retaliation and disability discrimination.

6

II.

This Court reviews a district court's grant of summary judgment de novo. *Calderon v. GEICO General Ins. Co.*, 809 F.3d 111, 120 (4th Cir. 2015). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All evidence must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in her favor. *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296. 300 (4th Cir. 2016).

III.

Spatafore contends that the City began to retaliate against her immediately upon her return from FMLA leave by requiring her to comply with an unrealistic performance improvement plan. This fact, combined with Spatafore's termination within a few months of returning from FMLA leave, suggests to Spatafore that the City fired her for taking FMLA leave, and any other reasons for her termination were pretextual.

FMLA anti-retaliation provisions "protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA." *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006). Retaliation claims "are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of *McDonnell Douglas*." *Id.* at 551 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

7

A plaintiff claiming FMLA retaliation "must first make a prima facie showing that [s]he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity." *Vannoy*, 827 F.3d at 304 (4th Cir. 2016) (citing *Yashenko*, 446 F.3d at 551). Under the *McDonnell Douglas* burden-shifting framework, if the plaintiff makes a prima facie case, the burden shifts to the defendant to "provide a legitimate nonretaliatory reason for taking the employment action at issue." *Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019). If an employer offers a nonretaliatory reason for the action, "the plaintiff bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001).

To meet her burden of demonstrating pretext, a plaintiff "may show that the employer's proffered explanation is unworthy of credence . . . or offer other forms of circumstantial evidence sufficiently probative of intentional discrimination." *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002). "[W]hen an employer gives a legitimate . . . reason for discharging the plaintiff, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000).

We assume without deciding that Spatafore has established a prima facie case of FMLA discrimination. But even in the light most favorable to her, she cannot create a triable issue of fact with respect to whether the City's proffered reasons for firing her were pretextual. It is clear from the record that Spatafore circumvented her supervisors and the grievance procedure in the Employee Handbook to complain to the Mayor's wife and the

8

City Council about her job and her supervisors. She also posted complaints about her position to a public Facebook page, identifying herself as a City employee. When termination is "based on little evidence of wrongdoing, a genuine issue might exist as to pretext" but "the evidence here plainly exceeds that threshold." *Sharif v. United Airlines*, 841 F.3d 199, 204 (4th Cir. 2016).

## A.

The City has not been perfectly consistent in how it has framed Spatafore's various instances of misconduct; the City's letter to Spatafore explained that she was being terminated for reasons including "insubordination" and "insolence," terms which Faulk struggled to define during his deposition. J.A. 857. Further, even in their briefs to this Court, the City on some occasions noted that Spatafore was fired for posting "false" information on Facebook, but at other times omitted that descriptor. Response Br. at 27–29, 40–41.

But the City's minor inconsistencies do not represent the "substantial change" in rationale that this Court has found sufficient to create a triable issue of fact with respect to pretext. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). In *Haynes v. Waste Connections, Inc.*, we noted that the employer proffered, for the first time during litigation, "an entirely different reason for the termination than was offered initially." *Id.* at 226. The employer's sudden introduction of an unrelated reason for termination created sufficient evidence of pretext to overcome summary judgment. By contrast, the City has routinely pointed to the same few instances of Spatafore's misconduct, dating from immediately prior to her termination through to this litigation. Though Faulk had difficulty

9

defining the terms in the letter sent to Spatafore, which was apparently drafted by Marsh, Faulk confirmed that the driving forces behind the decision to terminate Spatafore were her texts to Marino, her email to the City Council, and her Facebook posts. J.A. 394. A letter in the record from Marsh to Faulk, dated one day before Spatafore was fired, outlines these same reasons for terminating Spatafore. J.A. 740–42. The City has consistently represented that these instances of misconduct, which occurred just days before Spatafore's termination, were its reasons for firing her, and Spatafore has not shown evidence of a "substantial change" in rationale to create a triable issue of fact with respect to pretext. *Haynes*, 922 F.3d at 225.

## B.

Spatafore does not dispute that she took the actions which the City uses to justify her termination, nor does she dispute that she could legitimately be fired for these acts. Instead, she offers a number of arguments that her FMLA leave from three months prior, not her fireable conduct, was the true cause of her termination. None are supported by the evidence.

Contrary to Spatafore's assertions, the City did not violate its progressive discipline policy by firing Spatafore. To start, Spatafore was not fired for the first instance of her improper complaints to Marino; instead of taking the first opportunity to fire her, which might have accorded better with Spatafore's retaliation claims, the City refrained from taking disciplinary action for the subsequent two months. More importantly, the Employee Handbook lists "insubordination" as a fireable offense and defines the term to include "carrying out an action in a manner contradictory to the spirit of an order." J.A. 276.

10

Though City policy encourages verbal warnings and written reprimands for certain conduct, not every offense is afforded warnings before more drastic action is taken. When Spatafore went over the head of her supervisors with her grievances, she violated a standing order to abide by the grievance policy and thereby committed a fireable offense, per City policy.

Spatafore also emphasizes the fact that her FMLA leave had been discussed at the meeting about her policy violations. But she draws this fact from the deposition of City Attorney Marsh, and Marsh merely reported concern at the December 16 meeting that Spatafore might use her FMLA leave as a foundation for a retaliation suit. Marsh's mention of Spatafore's FMLA leave is therefore not evidence, as Spatafore implies, that her FMLA leave was discussed as a reason for her termination. None of Spatafore's other evidence indicates that she was fired for taking FMLA leave three months prior rather than for the reasons the City provided: her repeated violations of City grievance policy, coupled with her social media complaints about City management decisions.

Finally, Spatafore suggests that her termination while she was still out of the office on COVID leave could be proof of retaliatory animus. We disagree. First, it is not clear why firing Spatafore during COVID leave serves as evidence that the true cause of her termination was her FMLA leave from three months prior. In any case, Spatafore made her Facebook posts and sent her emails to Marino and the City Council while she was out with COVID, in the days immediately preceding her termination. The moment of her termination is therefore evidence that she was fired for those preceding acts, not for FMLA leave that had concluded in September.

11

IV.

Spatafore also appeals the district court's grant of summary judgment on her claim for disability discrimination under the West Virginia Human Rights Act ("WHVRA"). Because she does not qualify as "disabled" for the purposes of this statute, the district court did not err in granting summary judgment.

Under the WVHRA, it is unlawful "[f]or any employer to discriminate against an individual . . . if the individual is able and competent to perform the services required even if such individual is blind or disabled." W. Va. Code § 16B-17-9. The WHVRA defines "disability" to mean:

> (1) A mental or physical impairment which substantially limits one or more of such person's major life activities. The term "major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working;
> (2) A record of such impairment; or
> (3) Being regarded as having such an impairment.

W. Va. Code § 16B-17-3. A disability discrimination claim under the WVHRA operates in the same manner as the *McDonnell Douglas* burden-shifting framework. *See Woods v. Jefferds Corp.*, 824 S.E.2d 539, 547 (W. Va. 2019). Spatafore claims that she qualifies as disabled under the WVHRA because her ailments required her to take six weeks of FMLA leave.

However, since Spatafore's impairment did not "substantially limit[]" her at the time of her termination, she does not qualify as disabled under the WVHRA. We have held that a WVHRA plaintiff was not disabled despite a knee injury, diabetes and depression because "he was under no medical restriction at the time of his layoff, and he

12

provide[d] no testimony to indicate that the knee condition substantially limited any major life activity." *Miller v. Terramite Corp.*, 114 F. App'x 536, 538 (4th Cir. 2004). This is consistent with West Virginia Supreme Court of Appeals opinions explaining that plaintiffs who took temporary absences for illness were not disabled once the illnesses had stopped affecting their ability to perform their duties. *See Dickerson v. W. Va. St. Treasurer's Office*, 2020 WL 4354929, at *4 (W. Va. July 30, 2020); *Goddard v. Greenbrier Hotel Corp.*, 2013 WL 949497, at *1 (W. Va. Mar. 12, 2013). Spatafore made clear that once she returned from her leave, she had no issues performing all the regular functions of her job, and she did not present any evidence of limitations to her major life activities. Therefore, she does not qualify as disabled under the WVHRA.

## V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

13

PAMELA HARRIS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Dominique Spatafore cannot succeed on her claim under the West Virginia Human Rights Act. But I depart from my colleagues in their assessment of Spatafore's Family and Medical Leave Act (FMLA) retaliation claim. On my read, the record contains evidence that, viewed in the light most favorable to Spatafore, would allow a jury to find that the City of Clarksburg's stated reasons for terminating Spatafore were pretextual and that she was instead terminated because she took FMLA leave. Adhering strictly to the Rule 56 standard, I would let a jury decide what happened here.

To be clear, the City has a plausible account for its firing of Spatafore, which came immediately after an email that violated the City's workplace grievance policy and two Facebook posts attaching an internal City memorandum. But that is not the end of the matter. If Spatafore has put forward evidence from which a jury could infer that the City's purported reasons for her firing were pretextual, then granting summary judgment to the City is inappropriate under Rule 56. *Hollis v. Morgan State Univ.*, 153 F.4th 369, 381 (4th Cir. 2025). And at this stage in the proceedings, of course, Spatafore need not *prove* pretext; it is enough if she can create a genuine dispute, allowing a reasonable jury to find that the City's proffered explanation is a pretext for retaliation. *See id.* at 393 (Quattlebaum, J., concurring). I think there is enough here to satisfy that standard.

First, the City has struggled to explain exactly why Spatafore was fired. *See E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001) (jury may infer pretext from evidence that an employer "has offered different justifications [for an adverse

14

action] at different times"). As the majority recounts, Attorney Marsh's letter to Spatafore cited "insubordination, insolence, and unsolicited distribution of internal documents" – but not, at least expressly, the City's grievance policy – as the reasons for her termination. J.A. 857. The problem here is not (at least not only) that City Manager Faulk, who made the decision to fire Spatafore, could not in his deposition explain what was meant by "insubordination" or "insolence." It is that Marsh, Faulk, and the City seem unable to settle on a single account of what led to Spatafore's termination.

The City's litigating position, per its appellate briefs, is that Spatafore was fired because she violated the City's grievance policy when she emailed the City Council and Mayor about her COVID concerns and because she twice posted an internal City memorandum on Facebook. *See, e.g.*, Br. of Appellee at 27. The Facebook posts with the internal memorandum were perhaps problematic because they were false, *see id.* at 38, or perhaps not, *see id.* at 27. Whether Spatafore also was fired because of her contacts with Justine Marino, the Mayor's wife, depends on what page of the City's brief we are looking at. *Compare id. with id.* at 38, 40. Marsh, for his part, believes that the Marino contacts *were* behind the firing, J.A. 635, but does *not* believe the Facebook posts, though "briefly discussed," were a "focus," J.A. 637. And Faulk's deposition adds to the mix a whole new set of reasons for the firing – past "dress code violations, [] long lunches, complaints about [] bereavement leave," J.A. 458 – that have nothing to do with the three days of email and social media activity on which the City now relies. Whether these inconsistencies undermine the credibility of the City's explanation for Spatafore's termination is a matter I would leave to a jury.

15

A jury also could infer pretext from what appears to be the City's failure to follow its normal procedural sequence of progressive discipline before terminating Spatafore. *See Hollis*, 153 F.4th at 383 (plaintiffs may show pretext through evidence that an employer deviated from its "internal policies" and "normal procedural sequence" regarding an adverse action (citation and internal quotation marks omitted)).  It is undisputed that the City decided to fire Spatafore within three days of the events the City (most often) cites as the bases for her termination – the grievance email to the City Council and Mayor and the two Facebook posts.  It is also undisputed that during that time, nobody warned Spatafore, verbally or in writing, about her conduct, or gave her a chance to course correct.  But according to City Manager Faulk, the City's disciplinary procedure typically would involve several steps before a firing:  coaching, verbal and written warnings, performance improvement plans, and suspension.  None of that happened here.

The majority focuses on a different part of the record, the employee handbook, and infers from that document that an infraction like Spatafore's would properly be met with immediate termination.  Perhaps a jury would agree, but I do not think that reading is compelled, particularly in light of Faulk's testimony as to how the City's progressive discipline policy actually worked.  Indeed, when Marsh was asked in his deposition why the City jumped straight to termination instead of starting with some less drastic form of discipline, he did not, at least initially, cite the employee handbook or the purported severity of Spatafore's conduct – venturing instead that suspension "would be even more unfair" than termination; that termination "might have been preferable" to Spatafore; and that because Spatafore already was out of the office with COVID, suspension "didn't make

16

any sense, per se." J.A. 647. (Marsh then backtracked and insisted that Spatafore was immediately terminated because of "insubordination" and, newly, because she was "try[ing] to get Mr. Faulk fired." J.A. 648.) I would allow a jury to evaluate those explanations.

A jury might also consider why, if in fact Spatafore's messages to Marino in December 2021 were a cause for her termination, Spatafore's earlier messages of October 2021 – which, like the December messages, Marino forwarded to Faulk – generated no coaching, warning, or discipline of any kind. The majority draws from this failure to activate the City's usual progressive discipline procedure an inference in favor of the City: If the City were intent on retaliation, then it could have taken that first opportunity to fire Spatafore. But in this posture we must of course draw all reasonable inferences in favor of Spatafore, not the City, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), and a jury might also look at the October 2021 non-event and question whether conduct that raised no eyebrows in October was really a basis for termination in December.

Finally, it is true, of course, that Spatafore's December 2021 firing came just days after her emails and Facebook posts, and a full three months after her return from FMLA leave – evidence, the majority says, that Spatafore was fired for her December conduct and not for her FMLA leave. But on the other side of the ledger is the fact that almost as soon as Spatafore returned from leave in September, she was confronted by her supervisors with complaints about her work performance, presented with a performance improvement program, and warned that she would be fired if she could not meet these new job requirements. At that point, Spatafore had worked for the City for seven years, and had

17

been informed of no substantial issues with her work and subjected to only a few verbal warnings for long lunches and the like. But suddenly, after her FMLA leave, the City discovered a host of issues with her work and – according to Spatafore's deposition testimony – imposed on her new job responsibilities that were not "reasonable," "couldn't be done[,] and ha[d] since not been done by anybody that[ had] held that position." J.A. 107. If a jury were to credit this testimony, that would be the kind of evidence that could bridge the temporal gap between Spatafore's FMLA leave and her firing, *see Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022), and allow for a finding of retaliatory "animus," *see Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 259 (4th Cir. 2025) (holding employee to a "higher standard" than others may be evidence of discriminatory animus).

My point is not that a jury would be compelled to adopt Spatafore's version of events or to doubt the City's; a jury might well conclude that the City's explanations for Spatafore's firing were its "true reasons." *See Sears Roebuck*, 243 F.3d at 852. But I think there is evidence in this record from which a jury also might infer that the City's explanations are "unworthy of belief," *id.* at 853, and pretext for retaliation. For that reason, I would vacate the grant of summary judgment to the City on Spatafore's FMLA retaliation claim and allow a jury to resolve this case.

18