Christina E. JORDAN, Plaintiff,

v.

**RADIOLOGY IMAGING ASSOCIATES,**
et al., Defendants.

Civil No. RWT 06–3410.

United States District Court,
D. Maryland.

Sept. 12, 2008.

Linda M. Correia, Webster Fredrickson Correia and Puth PLLC, Washington, DC, for Plaintiff.

Akia Fox Roane, Kristine Jane Dunne, Arent Fox LLP, Michael L. Stevens, Arent Fox Kintner Plotkin and Kahn PLLC, Washington, DC, for Defendants.

## *MEMORANDUM OPINION*

ROGER W. TITUS, District Judge.

This case was instituted by Christina Jordan against her former employer and supervisors on December 22, 2006. At the conclusion of discovery, Plaintiff made a Motion for Partial Summary Judgment and the Defendants made a Cross–Motion for Summary Judgment. For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment shall be denied and Defendants' Motion for Summary Judgment shall be granted by a separate order.

## *BACKGROUND*

Defendant Radiology Imaging Associates is a medical practice specializing in radiological imaging. Defendant Finzio owns RIA. (Pl's Mot. Summ. J. ("PMSJ") Ex. 1, Melcher Dep. 236:2–4.) Defendant Scott Melcher is RIA's Chief Financial Officer. Melcher was hired in May of 2004, in part, to automate operations. (DMSJ Ex. 5, Melcher Dep. 12:8–9, 32:1–3; Ex. 7, Finzio Dep. 29:9–15.) Melcher reports directly to Dr. Finzio. (PMSJ Ex. 1 236:2–4.)

In 1995, Plaintiff began working at RIA as a receptionist. (PMSJ Ex. 2, Jordan Dep. 28:16–19.) Over the years, she received successive promotions. By 2004, Plaintiff had become the Manager of Billing & Collections. In her position, Plaintiff was responsible for overseeing RIA's billing, collections and payment posting operations. (DMSJ Ex. 2 185:1–20; DMSJ Ex. 3, Billing and Collections Manager Job Description.) Plaintiff supervised four Team Leaders: Tracy Coombs, Michelle Dewdney, Tammy Maples, and Rose Krznarich *née* Wagner. (DMSJ Ex. 4, Cadden Dep.20:11–21:16.) Each team leader supervised the coders, billers, collectors, and customer service representatives. (*Id.* at 20:1–4.)

Plaintiff's immediate supervisor was Darlene Cadden. (DMSJ Ex. 4 19:16–18.) Cadden reported directly to Melcher. (DMSJ Ex. 5 12:8–9.) Plaintiff received uniformly positive performance reviews during her tenure at RIA. (PMSJ Ex. 4, 2003 Performance Evaluation; Ex. 5, 2004 Performance Evaluation.)

In 1999, Plaintiff and her husband began trying to conceive a child. After six years of fertility treatments, Plaintiff learned that she was pregnant on April 19, 2005. (PMSJ Ex. 2 68:13–19.) She later learned that she was carrying quadruplets. (*Id.* at 68:20–69:4.) Plaintiff's fertility problems had been common knowledge at RIA. As a result, the news of her pregnancy spread rapidly. (DMSJ Ex. 2 69:5–70:12.) Cadden learned of the pregnancy immediately. (*Id.* at 70:13–22.) Melcher learned that Plaintiff was pregnant with multiples in "April, May, or June." (Pl's Resp. ("PR") Ex. 1, Melcher Dep., Aug. 14, 2007 117:7–118:2.)

Plaintiff lost one fetus within a month of learning that she was pregnant. In July 2005, Plaintiff's doctor advised her that she would need to go on bed rest when she was 28 weeks pregnant. (PMSJ Ex. 2 80:8–81:3.) Plaintiff's doctor also advised her to work two fewer hours per day starting on August 9. RIA permitted Plaintiff to reduce her hours without any reduction in pay. (DMSJ Ex. 2 83:3–6; Ex. 6, Melcher Decl. ¶ 14.)

When Plaintiff informed Cadden that she would require FMLA leave, Cadden directed Plaintiff to speak to someone in the Human Resources Department ("HR"). Plaintiff subsequently met with Meghan Kelly in HR. (PR Ex. 2 172:9–10.) Although the FMLA guarantees only 12 weeks of leave per year, Plaintiff informed Kelly that she expected to need 16–20 weeks of leave. (*Id.* at 170:1–3.) Plaintiff and Kelly also discussed the disability payments that Plaintiff would receive and the insurance premiums that Plaintiff would be required to pay while on leave. (*Id.* at 172:9–20.) Kelly provided Plaintiff with a form titled "Invoice" which showed the amount Plaintiff would need to pay in the "worst-case scenario," in which she required 20 weeks of leave. (PMSJ Ex. 9, Mock Invoice; DMSJ Ex. 16, Kelly Dep. 39:11–40:16, Aug. 1, 2007.) Kelly describes the form as "something I had printed up. It's not something we typically use, but just to show her what benefits she has, how much they are biweekly." (DMSJ Ex. 16 39:18–21.) Kelly stated that she believed Plaintiff "wanted something so she could prepare herself to know how much she was going to pay back...." (*Id.* at 39:15–17.)

Plaintiff states that she believed during these two meetings that she had formed an agreement with Cadden and Human Resources to allow her to return to work 16–20 weeks after going on the FMLA leave. (PR Ex. 2 169:16–170:13.) Kelly states that she did not believe there had been any sort of agreement during the meeting. (DMSJ Ex. 16 55:16–18.) Plaintiff began her FMLA leave on September 12, 2005. (DMSJ Ex. 2 82:13–17.)

Earlier in 2005, RIA began investing in a computerized billing and collections system. The new system was known as the "Radiology Information System" ("RIS"). (DMSJ Ex. 5 66:18–20.) The RIS eliminated much of the manual paperwork performed by the Billing and Collections Department, in which Plaintiff was a Manager.

After spending $600,000 to install RIS, RIA began using the system in August of 2005. (*Id.* At 84:10–13.) Melcher states that, because of the efficiencies RIS created, and in order to recoup the costs of the RIS installation, RIA decided to eliminate a number of positions in the Billing & Collections Department. (*Id.* at 25:7–13;

90:19–91:5; 91:18–93:6; 96:4–7; Ex. 6 ¶ 14.) Eight positions were to be eliminated, including Plaintiff's. (*Id.* at Ex. 6 ¶ 7.) However, Plaintiff's was the only management position selected for elimination, and RIA offered comparable positions to all eliminated employees except Plaintiff. (*Id.*) Melcher stated in his deposition that he chose Plaintiff's position for elimination because it was a redundant layer of management that duplicated the job functions of the team leaders. (PR Ex. 1, 25:5–13; 26:21–27; 31:15–32:5.) He testified that he asked each of the four team leaders, "what does [Plaintiff] help you with the most?" (*Id.* at 25:18–22.) He reported that two team leaders stated that Plaintiff "doesn't help us with anything." The other two team leaders allegedly stated that Plaintiff "helps us most with writing memos." (*Id.* at 25:1–3; 26:5–9; 26:15–18.) Although Melcher recounted these conversations in his deposition, none of the team leaders recalled Melcher approaching them to discuss Plaintiff's job functions. (*Id.* at Ex. 3, Coombs Dep. 23:5–7, Sep. 11, 2007; Ex. 4, Krznarich Dep., 51:21–52:4, Sep. 12, 2007; Ex. 17, Dewdney Dep. 30:13–31:9, Sep. 12, 2007; Ex. 18, Maples Dep. 31:22–33:1, Sep. 11, 2007.)

Melcher stated that he then examined Plaintiff's duties and responsibilities and concluded that "there was a lot of overlap between that position and all the team leaders' positions." (*Id.* at Ex. 1 26:21–27:2.) In "May or June" of 2005, Melcher met with Cadden and Nancy Gillooly, Director of Human Resources, to review Plaintiff's duties and responsibilities. (*Id.* at 30:9–31:4; 32:6–14). Melcher stated that he believed Plaintiff's job functions were mostly "fluff ... very vague and there was nothing you could [use to] determine whether or not you were successful." (PR Ex. 1 31:6–13.) He later defined "fluff" as "redundant." (*Id.* at 53:18–19.) He states that he concluded that most of the listed duties were already handled by

others, were better handled by others, would be eliminated once the RIS was running, or were not being performed. (*Id.* at 38:21–53:17.)

Melcher did not ask Cadden or Gillooly for an explanation of the duty descriptions or for an assessment of Plaintiff's role. (*Id.* at 37:12–16; 49:13–16; 50:22–51:9; 52:10–20; 54:1–8.) Instead, he asked whether Cadden would be able to take on Plaintiff's duties that did not overlap with Cadden's. Cadden allegedly indicated that she could take on the additional duties. (*Id.* at 51:11–14; 64:13–19.)

When RIA began to eliminate positions, Finzio and Melcher called a meeting to address job security. The staff was told that some positions would be eliminated and responsibilities would be changed. (*Id.* at 100:1–5.) Plaintiff was present at the meeting. (*Id.* at Ex. 4 153:16–154:6.) Also, at some point, Plaintiff asked Cadden about whether her position was in jeopardy. Cadden states that she advised Plaintiff, "Nobody's job is secure. My job's not even guaranteed." (*Id.* at Ex. 4 147:4–9.)

Melcher states that he decided to postpone informing Plaintiff that her position would be eliminated. (*Id.* at 142:17–22.) He avers that he made this decision:

> Because she was pregnant and we didn't—and I felt it would not be a good idea to tell her at that point. And secondarily, we were going to look for another position for her and we didn't know what that position was at the time.
>
> * * *
>
> I just felt like—because I didn't have— we didn't have anything to give her in return. We didn't have another position for her so why, you know, put her through more stress ... I felt comforta-

ble that something would come up at some point, we could do something. (*Id.* at 143:2–6; 144:7–13)

After deciding to eliminate Plaintiff's position, Melcher allegedly continued to search for positions to offer Plaintiff. (PR Ex. 1 147:9–11.) He subsequently approached Cadden for ideas. (*Id.* at 147:14–19.) She suggested offering Plaintiff an off-site transcription position. (*Id.* at 147:14–21.) Melcher states that he thought Plaintiff might accept the position "because ... you can do that off-site and stuff. It would be flexible for her...." (*Id.* at 147:22–148:4.) When asked why he thought Plaintiff might want a job she could do from home, Melcher responded:

"A: It's just the kind of accom—anytime if you work from home—if I could work from home, it's easier, I don't have to commute. And I can—I can—if I can work at different times of the day, that's great. It fits my schedule more as long as—

\* \* \*

Q: Why did you think she needed flexibility?

A: Because she has—she has kids. If you can work from home, why not ... I would think that most people would agree that they would work from home if they could ... It allows you to work at different hours of the day.... She's got a family. She's got—things get done at certain parts of the day. I have a family. So if I could work in the evenings sometimes, I'd rather work in the evenings."

(*Id.* at 148:19–149:1; 149:6–9; 150:1–3; 150:7–8). However, Melcher decided not to offer Plaintiff the part-time position.

Plaintiff gave birth to triplets in late November of 2005. (PMSJ Ex. 2 162:16–18.) Two days after her release from the hospital, Plaintiff received a letter from Meghan Kelly. The letter stated that Plaintiff's 12–weeks of FMLA leave would expire on December 1, 2005, and that "as of December 2, 2005[RIA] no longer has a legal responsibility to hold [Plaintiff's] position with the company." (DMSJ Ex. 2 109:22–110:2; Ex. 13, FMLA Expiration Letter.)

On December 10, 2005, Plaintiff received another letter signed by Kelly on behalf of RIA. The letter was dated December 8, 2005. (*Id.* at 112:6–15; Ex. 14, Termination Letter.) The pertinent section of the letter reads: "As you are aware, RIA has been reevaluating whether it can continue to support a billings operations position. The billings operation position will be eliminated effective December 2, 2005." (*Id.* at Ex. 14.) The letter also informed Plaintiff that she would continue on the company health insurance until December 31, 2005, and would continue to receive her disability benefits. (*Id.*) Finally, the letter also invited Plaintiff to apply for future open positions at RIA. (*Id.*)

On December 12, 2005, after receiving the notice of her termination, Plaintiff had a conversation with Edward Hannon, who was a Senior Disability Specialist at the insurance company handling Plaintiff's employment benefits. After their conversation, Hannon sent Plaintiff a letter dated December 12, 2005. The letter stated that it was to confirm the details of the conversation he had with Plaintiff, and to confirm that the insurance company would continue to pay Plaintiff's benefits until January 13, 2006, "with an anticipated return to work date of January 14, 2006." (*Id.* at Ex. 2 261:1–263:16; Ex. 15, UnumProvident Letter.) Plaintiff does not recall whether she told Hannon during their conversation that she was not returning to work at RIA. (*Id.* at Ex. 2 262:14–19.) She states that "as far as [she] was concerned,

that return to work date of the 14th was the date the doctor released me after eight weeks of post-partum to return to a job." (*Id.* at Ex. 2 263: 4–6.)

In February of 2006, a full-time Customer Service Representative position became open in RIA's Billing Department. The position was offered to Plaintiff. (DMSJ Ex. 5 155:1–16; Ex. 16 102:20–103:8.) Melcher suggested that Plaintiff be paid at the highest rate authorized for the position, which was $20 per hour. However, this was still less than Plaintiff had been earning before her termination. (*Id.* at Ex. 5 156:7–10.)

When Plaintiff was offered the position, she requested that she be allowed to work part-time while retaining the full-time salary. (*Id.* at 188:11–16.) RIA refused Plaintiff's proposal, and Plaintiff subsequently declined the offer. (*Id.* at Ex. 16 107:10–12.) She stated that she felt the salary was too low and she was uneasy about working for her prospective supervisor who was someone she had previously supervised. (*Id.* at Ex. 2 192:20–21.)

Cadden later voluntarily resigned. (*Id.* at Ex. 4 11:18–12:1.) RIA initially advertised her position. However, two team leaders reportedly advised Melcher that Cadden did not need to be replaced because the team leaders and Melcher could handle her duties. (*Id.* at Ex. 5 161:10–11, 21–22; 162:1–4, 11–15; Ex. 18, Maples Dep. 34:8–14; Ex. 19, Coombs Dep. 33:8–18.) Cadden's position was subsequently eliminated. (*Id.* at 25:5–8.)

Plaintiff was employed on an "at will" basis. The terms of her employment are set forth in an acknowledgment form Plaintiff signed on December 12, 2001. (DMSJ Ex. 8, Employee Acknowledgment Form; Ex. 2 165:19–167:12.) Only the Executive Vice President ("EVP") and the Chief Operating Officer ("COO") of RIA have "the authority to enter into any agreement, written or oral, for employ-ment for any specific period of time, for any specific term or condition of employment, for any benefit," or any agreement contrary to one of employment on an "at will" basis. (*Id.* at Ex. 8; Ex.2 167:13–21.) Any such agreement would have to be in writing and signed by the employee and the EVP or COO. (*Id.* at Ex. 8; Ex. 2 167:22–168:2.) Plaintiff also signed a Confidentiality Agreement on March 21, 2002, which contained a similar statement regarding her "at will" employment status. (*Id.* at Ex. 9; Ex. 2 176:12–22; 177:20–22; 178:1–8.)

### STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A material fact is one that 'might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183 (4th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

To avoid summary judgment on a properly supported motion, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256, 106 S.Ct. 2505. Of course, the Court must view the evidence in the light most favorable to the nonmoving party. *Francis v. Booz, Allen & Hamilton, Inc.,* 452 F.3d 299, 302 (4th Cir.2006). Nevertheless, this

Court recognizes the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir.1993) (quoting *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987)); *Celotex Corp.,* 477 U.S. at 323–24, 106 S.Ct. 2548 (internal quotation marks omitted).

## *ANALYSIS*

### I. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff seeks partial summary judgment on her Pregnancy Discrimination Act and Promissory Estoppel claims. However, because Plaintiff is unable to show direct evidence of discrimination, and the evidence before the Court does not support her assertion that she reasonably relied on a clear and definite promise from Defendants, Plaintiff's Motion for Partial Summary Judgment must be denied.

#### A. Pregnancy Discrimination Act

 Under the Pregnancy Discrimination Act, a pregnancy discrimination claim is "analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII." *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 297 (4th Cir. 1998) (quoting *Boyd v. Harding Acad.,* 88 F.3d 410, 413 (6th Cir.1996)). Therefore, a plaintiff may establish her claim "through direct or circumstantial evidence" that her pregnancy "motivated the employer's adverse employment decision." *Hill,* 354 F.3d at 284.

 Plaintiff grounds her Motion for Partial Summary Judgment on her assertion that there is direct evidence of discrimination in this case. Direct evidence is "evidence of conduct or statements that both [1] reflect directly the alleged discriminatory attitude and [2] that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 520 (4th Cir.2006) (quoting *Taylor v. Va. Union Univ.,* 193 F.3d 219, 232 (4th Cir.1999)) (en banc) *abrogated on other grounds by Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *see also Fuller v. Phipps,* 67 F.3d 1137, 1142 (4th Cir.1995). If believed, direct evidence "would prove the existence of a fact ... without any inference or presumptions." *O'Connor v. Consol. Coin Caterers Corp.,* 56 F.3d 542, 548 (4th Cir. 1995) (quoting *Bodenheimer v. PPG Indus., Inc.* 5 F.3d 955, 958 (5th Cir.1993)), *rev'd on other grounds O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Consequently, a plaintiff faces a demanding standard when attempting to demonstrate direct evidence. *Compare, Loveless· v. John's Ford, Inc.,* 232 Fed.Appx. 229 (4th Cir.2007) (direct evidence when supervisor stated that he needed more "young blood" and that plaintiff was a "f* * *ing dinosaur" who "would ·be next to go" and made further derogatory statements at the time of plaintiff's firing) *with Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 511–12 (4th Cir.1994) (concluding that the statement "there comes a time when we have to make way for younger people" reflected "no more than a fact of life" and was too remote to show age discrimination).

 In this case, Plaintiff argues that Melcher's statement about his decision to postpone informing Plaintiff that he planned to terminate her is direct evidence of discrimination. Plaintiff relies on *Vaughn v. Edel,* 918 F.2d 517, 521–22 (5th Cir.1990) to support this contention. In *Vaughn,* a manager declined to correct the mistakes of an African–American employee whose performance was deficient. The employer's lack of correction directly led to the employee's subsequent poor performance and termination. *Id.* In this case, unlike the situation in *Vaughn,* even

if Melcher had informed Plaintiff that she was about to be terminated it would not have prevented her from losing her job. Therefore, even if *Vaughn* were binding precedent on this Court, it would be inapposite.

Furthermore, Plaintiff's argument appears to conflate two different decisions: (1) whether to terminate Plaintiff, and (2) when to inform Plaintiff of her termination. The fact that Melcher chose to postpone informing Plaintiff of her planned termination because she was in the midst of a difficult pregnancy does not support the assertion that he terminated Plaintiff because she was pregnant.

Plaintiff also challenges Melcher's generalization about the preferences of working parents. When Cadden suggested offering Plaintiff a part-time position, Melcher rejected her proposal and chose to offer Plaintiff a full-time position instead. However, Melcher stated that he considered offering the part-time position to Plaintiff because Plaintiff had become a parent and he believed working parents often prefer to work from home and to have flexible schedules. This gender-neutral statement is only evidence of Melcher's perceptions about parents in general, not about pregnant women in particular. As such, it cannot be used as direct evidence of unlawful discrimination. *See Lack v. Wal–Mart Stores, Inc.,* 240 F.3d 255, 262 (4th Cir.2001) (finding no Title VII violation when supervisor was "indiscriminately vulgar ... to men and women alike"); *Holman v. Indiana,* 211 F.3d 399, 402 (7th Cir.2000) (stating that Title VII does not provide relief against the "equal opportunity" harasser who "treat[s] both sexes the same (albeit badly)"). Furthermore, this statement, which was made several months after Plaintiff's termination, was not contemporaneous with the decision to terminate Plaintiff and did not directly relate to

that decision. *See McCray v. Pee Dee Reg'l. Transp. Auth.,* 263 Fed.Appx. 301, 306 (4th Cir.2008) (citing *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 511–12 (4th Cir.1994)). Rather, it related to another employee's proposal to offer Plaintiff a new position.

At the Summary Judgment stage the Court is required to draw every reasonable inference in favor of the non-movant. As the movant, Plaintiff has simply not met her burden to demonstrate acts or statements which can only reasonably be interpreted as direct proof that Defendants harbored discriminatory motives.

Even when Plaintiff is given the benefit of all reasonable inferences, as is required when considering Defendants' Motion for Summary Judgment, Plaintiff has failed to demonstrate direct evidence of discrimination. For Melcher's comments about the preferences of working parents to demonstrate unlawful bias, the fact-finder would be required to make an inferential leap. Specifically, the factfinder would have to infer that because Melcher believed working parents preferred part-time positions, and Plaintiff was about to become a parent, Melcher must have believed Plaintiff should be terminated from her full-time position. However, the Fourth Circuit has specifically defined direct evidence to be evidence which proves a fact *"without* any inference or presumptions." *O'Connor,* 56 F.3d at 548 (emphasis added). Similarly, even if Plaintiff is given the benefit of all reasonable inferences, Melcher's decision to delay informing Plaintiff of her termination simply cannot be reasonably construed as direct evidence of discrimination. Because Plaintiff cannot demonstrate direct evidence of discrimination, and she has not shown that she is entitled to judgment as a matter of law based on circumstantial evidence, Plaintiff's Motion for

Partial Summary Judgment on this count must be denied.

## B. Promissory Estoppel

 Maryland has adopted the promissory estoppel test of the Restatement (Second) of Contracts § 90(1). *Pavel Enters., Inc. v. A.S. Johnson Co.*, 342 Md. 143, 674 A.2d 521, 532 (1996). To succeed on a promissory estoppel claim, a plaintiff must show that there was:

1. a clear and definite promise; 2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; 3. which does induce actual and reasonable action or forbearance; and 4. causes a detriment which can only be avoided by the enforcement of the promise.

*McKenzie v. Comcast Cable Commc'ns., Inc.*, 393 F.Supp.2d 362, 372–73 (D.Md. 2005) (quoting *Pavel Enters.*, 674 A.2d at 532). "A clear and definite promise ... is one that reasonably defines the contours of the action or forbearance." *Id.* at 373.

 In this case, Plaintiff states that she believed RIA agreed that she would be reinstated after 16 to 20 weeks of leave. However, the evidence does not support Plaintiff's assertion that she reasonably relied on a clear and definite promise to that effect.

After RIA management held a meeting to inform all the employees in the Billing & Collections Department that positions would be eliminated, Plaintiff approached Cadden to ask about her job security. Cadden states that she informed Plaintiff that "Nobody's job is guaranteed—everybody can be replaced." (Cadden Dep. 147:4–9.) Cadden later directed Plaintiff to speak to Kelly in Human Resources about Plaintiff's plans to take extended leave. The conversation with Kelly concerned making arrangements for receiving disability benefits and determining the premium amounts Plaintiff would have to repay. Although Kelly was aware that it was possible Plaintiff would be out for up to 20 weeks, there is no evidence that she said anything constituting a promise that Plaintiff would actually be reinstated after 20 weeks. Although no one said anything in the meeting that would cause Plaintiff to question whether she would be reinstated, it does not necessarily follow that a clear and definite promise of reinstatement was made.

The documents Plaintiff presents also fail to provide evidence of a promise. The mock invoice shows Plaintiff how much she would be required to repay if she needed 20 weeks of leave. The letter Plaintiff received from UnumProvident, which refers to a return to work date of January 14, 2006, also lacks a definite promise. The letter did not come from RIA, and clearly states that the source for the return date was a conversation Plaintiff had with the UnumProvident representative, which took place after Plaintiff had been informed of her discharge date. Moreover, Plaintiff's own deposition testimony confirms that she did not understand the "return to work" date to be the date when she would be able to return to RIA. Nor would it have been reasonable for her to believe the "return to work" date referred to her continued employment at RIA considering that she had already received notice of her termination.

 Furthermore, even if there had been a clear and definite promise, it would have been unreasonable for Plaintiff to rely on the representations of Hannon or Kelly. Plaintiff was employed on an "at will" basis. *See Samuels v. Tschechtelin*, 135 Md.App. 483, 763 A.2d 209, 232 (2000) (setting forth Maryland law of "at will" employment). The Employee Acknowledgment Form and Confidentiality Statement that Plaintiff signed demonstrate

that she was aware that only RIA's Executive Vice President or Chief Operating Officer could alter her employment status from an "at will" basis. There is no evidence that either of these individuals made any indication that they were altering Plaintiff's employment status.

Because Plaintiff has failed to present evidence of a promise by Hannon or Kelly, and it would be unreasonable for Plaintiff to believe Hannon or Kelly could alter her employment status, Plaintiff has not demonstrated that she is entitled to Summary Judgment on this count.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Pregnancy Discrimination Act

 Because there is no direct evidence of discriminatory intent, the Court must evaluate Plaintiff's discrimination claims under the *McDonnell Douglas* burden-shifting analysis for circumstantial evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this rubric, the employee must first establish a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817. The employer is then required to produce evidence of a non-discriminatory justification for the adverse employment action. *Id.* The burden then shifts back to

the employee to demonstrate that the asserted justification is pretextual. *Id.* At 803–05. At this point, an employee's "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). However, the Supreme Court has stressed that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* For example, a Defendant would be entitled to summary judgment if "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.*

### 1. Plaintiff's Prima Facie Case

 The Fourth Circuit uses a modified prima facie [1] analysis when examining employment decisions taken as part of a reduction-in-force ("RIF").[2] *EEOC v. Western Elec. Co.*, 713 F.2d 1011, 1014–15 (4th Cir.1983). Under this modified test,

---

1. In the standard discharge context, a prima facie case consists of showing (1) that the plaintiff is a member of a protected class; (2) that she suffered an adverse employment decision; (3) that she was performing her duties to the satisfaction of her employer's legitimate expectations at the time of the adverse employment decision; and (4) that the position remains open or has been filled by a similarly qualified person outside the protected class. *Hill*, 354 F.3d at 285. Plaintiff argues that the redistribution of her duties to Cadden and the team leaders amounts to a "constructive replace[ment]." She relies on Seventh Circuit case law to support this proposition. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir.2000); *Miller v. Borden*, 168 F.3d 308

(7th Cir.1999). While these cases are well-reasoned and express legitimate concerns, there is no need to look to other circuits as the Fourth Circuit has already delineated a test that is designed to account for this type of discharge.

2. This modified analysis was born out of recognition that the purpose of employment discrimination laws would be frustrated if employers conducting lay-offs could select the employees to terminate based on impermissible motives. Although neither party uses the term "reduction in force," RIA's goal of eliminating the jobs made obsolete by the RIS falls squarely into the common usage of that term.

when the decision to terminate an employee is part of a RIF, and not based on the employee's job performance, a prima facie case consists of showing that the employee (1) was in a protected class, (2) was discharged, (3) was performing satisfactorily at the time of discharge, and (4) "persons outside the class were retained in the same position or that there was some other evidence that the employer did not treat [the class] ... neutrally in deciding to dismiss the plaintiff." *Herold v. Hajoca Corp.*, 864 F.2d 317, 319 (4th Cir.1988); *Blistein,* 74 F.3d at 1470 n. 13.

■ It is undisputed that Plaintiff was a member of a protected class and was discharged. Plaintiff has also satisfied the third element of the *Herold* test because she has provided substantial evidence that her employer was satisfied with her job performance.

With regard to the fourth element, Plaintiff's position was ostensibly eliminated because it was redundant. However, if the jobs were redundant and one job could have been absorbed into another, then Plaintiff has established an inference of discrimination by showing that a pregnant employee's position was selected for elimination instead of a non-pregnant employee's position. *See Texas Dept. of Comty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (describing the prima facie case as evidence which "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors"). Although this is a weak inference, it is sufficient to establish a prima facie case under *McDonnell Douglas.*

## 2. Defendants' Proffered Justifications

■ Once a plaintiff succeeds in making out her prima facie case, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill,* 354 F.3d at 285. Defendant has produced evidence showing that it conducted a RIF to cut costs and eliminate redundancies. Defendant has also produced evidence that Plaintiff's position was eliminated because of the unnecessary duplication of job functions. Because Defendant has met its burden of production on this issue, "the *McDonnell* Douglas framework ... disappear[s], and the sole remaining issue [is] discrimination *vel non.*" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

## 3. Pretext

■ At the third stage, a plaintiff must be permitted to attempt to demonstrate that the defendant's asserted justifications are pretextual. *Id.* Here, Plaintiff argues that pretext is shown by (1) Melcher's statements during his deposition where he speculated about the job preferences of working parents, and (2) Melcher's decision to postpone telling Plaintiff about her termination while she was in the middle of a high-risk pregnancy. However, even if every reasonable inference is drawn in Plaintiff's favor, neither of these statements constitutes evidence of pretext. Melcher's comment about working parents was gender-neutral and did not concern Plaintiff's ability to work while pregnant. Furthermore, Melcher's decision to postpone informing Plaintiff of her termination does not indicate that his reasons for terminating Plaintiff were more likely to be false.

Plaintiff further argues that Melcher made his decision to terminate Plaintiff too quickly during Melcher's meeting with Cadden and Gillooly. Plaintiff contends that Melcher did not display the kind of "thoughtful consideration" appropriate for such a decision. (Pl's Opp. at 23.) Howev-

er, the undisputed evidence shows that Melcher, who had the authority to terminate Plaintiff's position, read Plaintiff's job description, determined that it was "fluff, (i.e. redundant given the tasks performed by other employees)" and received confirmation from his advisors. There is no indication that Melcher was required to go through any sort of deliberative process before terminating Plaintiff, and his failure to conduct more extensive discussions before reaching his conclusion is not evidence of pretext.

Plaintiff also contends that there is evidence that RIA did not have a legitimate plan to reduce its Billing and Collections staff. Plaintiff notes that the Defendants have not presented "any plan, spreadsheet, or analysis to support the alleged reorganization and cost savings." However, the uncontroverted evidence shows that the reorganization plan was well-known, and that Defendants Melcher and Forzio conducted at least one meeting to address the fears spreading through the staff about the potential RIF.

Plaintiff also notes that each of the other employees whose position was eliminated found a new position within the company for substantially the same pay. However, each of the other reorganized employees filled a non-supervisory position and was moved to another non-supervisory position, which paid less than Plaintiff's position. That RIA was able to find non-supervisory positions for laid-off workers, but unable to find new managerial positions, does not cast any doubt on RIA's assertion that it intended to cut redundant managerial layers. Also, although four low-level employees were hired into the Billing & Collections Department, there does not appear to be any dispute that all except one of these new hires replaced an RIA employee who resigned.

Finally, Plaintiff calls into question Melcher's account of the deliberative process he used when he came to his decision to terminate Plaintiff. Melcher claimed that at some point in the process he asked the team leaders what tasks Plaintiff performed for them as a manager. Melcher stated that two of the team leaders told him that Plaintiff did nothing for them, while the other team leaders told him that Plaintiff helped them with writing memos. Plaintiff argues that this is a disputed issue of fact precluding summary judgment because the team leaders either could not recall these conversations or denied that they had talked to Melcher about Plaintiff's role. However, this lone disagreement concerning a small element of the decision to terminate Plaintiff is immaterial to the issue of whether Defendants' proffered justifications were pretextual, let alone the ultimate issue of whether Defendant's decision making process was tainted by impermissible animus. Even if the Court resolves this factual dispute in Plaintiff's favor, and presumes that Melcher never spoke to the team leaders about Plaintiff, there is still no evidence that sheds doubt on Defendants' other stated justifications for terminating Plaintiff's employment. Instead, the only evidence before the Court concerning Defendants' proffered justifications shows that RIA spent an enormous amount of money to streamline its billing practices and consequently eliminated several positions in its Billing & Collections Department, including Plaintiff's. In light of Plaintiff's weak prima facie case, the immateriality of the remaining factual issues, and Plaintiff's inability to demonstrate pretext, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's Pregnancy Discrimination Act claim.

## B. TITLE VII SEX DISCRIMINATION

Plaintiff also alleges discrimination on the basis of sex. Plaintiff does not contend that she was discriminated against for

being a woman. Rather, she believes she was terminated because she is a woman who has children. This type of claim is commonly referred to as "sex-plus" discrimination. *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (holding that Title VII forbids employers from having "one hiring policy for women and another for men—each having pre-school-age children"); *Fisher v. Vassar Coll.*, 70 F.3d 1420, 1433 (2d Cir.1995) (defining "sex-plus" discrimination as discrimination where "sex is considered in conjunction with a second characteristic . . . .") *aff'd en banc; see also Hess–Watson*, 2004 WL 34833, at *3–4 (W.D.Va. Jan.4, 2004).

In this case, Plaintiff bases her "sex-plus" claim on Melcher's comment that "most people [with children] would agree they would rather work from home if they could." For the reasons stated above, Melcher's comment is not direct evidence of sex-plus discrimination. Therefore, the Court is required to analyze this claim under the *McDonnell Douglas* framework.

As with her pregnancy discrimination claim, Plaintiff can make out a prima facie showing only if she presents evidence that "persons outside [her] class were retained in the same position or that there was some other evidence that the employer did not treat [the class] . . . neutrally in deciding to dismiss [her]." *Herold*, 864 F.2d at 319. However, Plaintiff has not directed the Court to any evidence that women with children were treated differently from men with children. *See, e.g., Hess–Watson*, 2004 WL 34833, at *2 (dismissing sex-plus discrimination claim because the plaintiff had presented "no evidence that similarly situated males . . . with small children, were treated differently than women with

small children"). Because Plaintiff has failed to present evidence that women with children were treated differently from men with children, Plaintiff cannot make out a prima facie case for sex-plus discrimination.

## C. PLAINTIFF'S FMLA CLAIMS

### 1. FMLA Interference

Under the FMLA, an employee is entitled to twelve weeks of unpaid leave during any twelve month period for serious medical conditions such as childbirth. 29 U.S.C. § 2612(a)(1)(A) (2000). An employee taking FMLA leave is entitled to restoration either to "the position of employment held . . . when the leave commenced" or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(A)-(B).

However, the right to restoration is not absolute. *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 547 (4th Cir.2006). The Fourth Circuit has clarified that the FMLA "does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave." *Id.* The Fourth Circuit noted that any different rule would lead to the "anomalous result" of mandating that "an employer who eliminated an entire branch of the business while a covered employee was on leave would . . . be required to retain that employee and restore him to a non-existent position." *Id.* at 548. Therefore, an employer that does not restore an employee returning from FMLA leave can avoid liability by showing "that [the] employee would not otherwise have been employed at the time reinstatement is requested." *Yashenko*, 446 F.3d at 549 (citing 29 C.F.R. § 825.216(a)).[3]

---

3. The Fourth Circuit has interpreted this standard to put a burden of production on the employer. *Yashenko*, 446 F.3d at 549. When an employee shows that she is entitled to

restoration under the FMLA, the employer must "come forward with evidence that it would have discharged the employee whether or not he took FMLA leave." *Id.* However, the

There is no dispute that Plaintiff was entitled to FMLA leave and would have been entitled to restoration if her position had not been eliminated. However, Defendants have produced substantial evidence that they eliminated Plaintiff's position as part of a RIF. As in *Yashenko*, Plaintiff has failed to present any evidence that casts doubt on the legitimacy of Defendants' RIF or Defendants' justifications for eliminating Plaintiff's position.

Plaintiff attempts to distinguish *Yashenko* by arguing in hindsight that Defendants' cost-cutting endeavors were ultimately ineffective. However, regardless of the efficacy of the reorganization, RIA would not have been required to restore an employee to a non-existent position.

## 2. FMLA Retaliation

■ The FMLA prohibits employers from discharging employees in retaliation for taking FMLA leave. 29 U.S.C. § 2615(a)(2). Absent direct evidence, FMLA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Yashenko*, 446 F.3d at 550–51.[4] To make out a prima facie case, a plaintiff must show (1) that she engaged in protected activity, (2) that the employer took adverse action, and (3) that the adverse action was causally connected to the plaintiff's protected activity. *Id.* (citing *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir.1998)). "Temporal proximity" between the "absence and the elimination of [the] job ... satisfies the less onerous burden of making a prima facie case of causality" even if it does not conclusively establish the causal connection. *Id.* (citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989)). If an employee establishes a prima facie case of retaliation, then the employer must "offer a non-discriminatory explanation for the termination." *Id.* If the employer meets this burden of production, then the employee "bears the burden of establishing that the employer's proffered explanation is a pretext for FMLA retaliation." *Id.* (citing *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir.2001)).

■ In this case, Plaintiff has shown that (1) she took leave, (2) she suffered an adverse employment action, and (3) the adverse employment action was close in time to her taking leave. Therefore, Plaintiff has established a valid prima facie case. However, Defendants have proffered extensive evidence to demonstrate that Plaintiff's dismissal, which was decided upon prior to the time she began to take FMLA leave, took place as part of a non-discriminatory corporate reorganiza-

Fourth Circuit has not resolved which party will bear the ultimate burden of persuasion. *Id.* (stating that an employee's claim failed because the employer had presented evidence that the plaintiff was terminated in a reorganization and the employee failed to offer evidence to "dispute the company's contention that Yashenko's position was eliminated in a legitimate reorganization"). There is currently a circuit split on the burden of proof issue. *Compare Rice v. Sunrise Express*, 209 F.3d 1008, 1018 (7th Cir.2000) (ultimate burden falls on employee), *with Smith v. Diffee Ford–Lincoln–Mercury, Inc.*, 298 F.3d 955, 963 (10th Cir.2002) (employer has the ultimate burden).

4. Plaintiff has not presented direct evidence of retaliation. In Plaintiff's Opposition, she states that "Melcher expressed concern that Ms. Jordan was 'never [here],' in the meeting in which he concluded that Ms. Plaintiff's position should be eliminated." Plaintiff cites to the Gilooly Deposition as evidence of this statement. However, the page Plaintiff cites was not included in the exhibits submitted to the court. Even if Plaintiff had submitted evidence of this statement, there is no indication that it was in relation to FMLA related leave, as opposed to Plaintiff's other absences. Plaintiff also cites a statement by Rose Krznarich, Plaintiff's underling at the time, who had no role in the decision to eliminate Plaintiff's position.

tion and Plaintiff has failed to advance any evidence that Defendants' justification is pretextual. Therefore, Defendants are entitled to summary judgment on this claim.[5]

### D. Promissory Estoppel

For the reasons stated above in subsection I(B), the Court finds that Plaintiff has failed to advance any evidence of a clear and definite promise upon which she reasonably relied. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Promissory Estoppel claim shall be granted.

### CONCLUSION

Colin Powell observed in his autobiography "My American Journey" that "[b]ad news isn't bad wine. It doesn't improve with age." Colin Powell & Joseph E. Persico, *My American Journey* 320 (1995). In this case, with the benefit of the 20/20 vision of hindsight, it is apparent that the Defendants' well-intentioned, legally benign, and understandable decision to delay giving the bad news to the Plaintiff about her impending RIF while they explored other employment options for her had the opposite of its desired effect. Rather than to cushion the blow, it exacerbated the situation and led to the Plaintiff's understandable belief that the decision had been made as a result of her pregnancy or her use of FMLA leave. As a personnel matter, it arguably could have been handled better, but it is not the function of the court to act as a super-personnel agency. Rather, a court must confine itself to whether the law has been violated, and here the conclusion, as painful as it may be, is that it was not.

Accordingly, Plaintiff's Motion for Partial Summary Judgment shall be denied and Defendants' Motion for Summary Judgment shall be granted. A separate order follows.

### ORDER

Upon consideration of the Plaintiff's Motion for Partial Summary Judgment (Paper No. 23); the Defendants' Cross–Motion for Summary Judgment (Paper No. 27), the Motion to Exclude Evidence Pursuant to Rule 27(C) of the Federal Rules of Civil Procedure (Paper No. 35), the Oppositions and Replies, and the argument of counsel heard on June 2, 2008, it is, for the reasons set forth in the accompanying Memorandum Opinion, this 12th day of September, 2008, by the United States District Court for the District of Maryland,

**ORDERED,** that the Motion to Exclude Evidence Pursuant to Rule 27(C) of the Federal Rules of Civil Procedure (Paper No. 35) is **DENIED;** and it is further

**ORDERED,** that the Plaintiff's Motion for Partial Summary Judgment (Paper No. 23) is **DENIED;** and it is further

**ORDERED,** that the Defendants' Cross–Motion for Summary Judgment (Paper No. 27) is **GRANTED;** and it is further

**ORDERED,** that **JUDGMENT FOR COSTS** be entered in favor of the Defendants; and it is further

**ORDERED,** that the Clerk of this Court is directed to **CLOSE THE CASE.**

---

**5.** Because all of Plaintiff's substantive claims have been dismissed, it is not necessary for the Court to decide whether Defendant Finzio may be held personally liable on Plaintiff's claims. Because all of the evidence Plaintiff has moved to strike in her 37(c) motion was either previously disclosed to Plaintiff or not relevant to the Court's decision, Plaintiff's Motion to Strike shall be denied.