**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-2521**

GARY WAAG,

Plaintiff – Appellant,

v.

SOTERA DEFENSE SOLUTIONS, INC.,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  T. S. Ellis, III, Senior District Judge.  (1:14-cv-01715-TSE-JFA)

Argued:  December 7, 2016                           Decided:  May 16, 2017

Before NIEMEYER, TRAXLER, and HARRIS, Circuit Judges.

Affirmed by published opinion.  Judge Traxler wrote the opinion, in which Judge Niemeyer and Judge Harris joined.

**ARGUED:** Andrew Steven Cabana, LAW OFFICE OF ANDREW CABANA, PC, Alexandria, Virginia, for Appellant.  Devin James Stone, BARNES & THORNBURG LLP, Washington, D.C., for Appellee.  **ON BRIEF:** Teresa Lynn Jakubowski, Washington, D.C., John F. Meyers, BARNES & THORNBURG LLP, Atlanta, Georgia, for Appellee.

TRAXLER, Circuit Judge:

Gary Waag brought an action alleging that his former employer, Sotera Defense Solutions, Inc., violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, by not restoring Waag to his position when he returned from two-months-plus of medical leave; by placing him in a new job that was not equivalent to the one he held before he went on leave; and by terminating Waag from the new job because he took medical leave. The district court granted summary judgment to Sotera, and Waag appeals. We affirm.

## I.

### A.

Before his employment with Sotera, Waag worked for Potomac Fusion, Inc., reporting directly to Dan Haug. At Potomac Fusion, Waag was "Senior Director of Operations, National Intelligence Programs." J.A. 227. Waag's primary duties at Potomac Fusion included "provid[ing] budgetary guidance" and oversight for national security programs, J.A. 74; developing standardized "program controls," J.A. 75; and "support[ing] business development efforts to . . . grow the footprint of the firm," J.A. 77, particularly in the area of modeling and simulation.

In December 2011, Sotera, a defense contractor that provides technology products and services to federal agencies, acquired Potomac Fusion, which became Sotera's Data Fusion Analytics ("DFA") division. Sotera installed Haug as Vice President for the DFA division, and Waag maintained the "Director of Operations" title he had held at Potomac Fusion for Sotera's DFA division. At the time of the acquisition, "key Potomac Fusion

2

employees" were identified and offered "retention bonus agreements." J.A. 215. Despite his Senior Director title, Waag "was not deemed critical to the strategic growth of the company," *id.*, and therefore was not identified as a key employee. *Id.* Waag's duties at Sotera included oversight of issues related to "recruiting, security, IT, and facilities." J.A. 79. Waag was also involved in the development of new business at Sotera after the acquisition.

In September 2012, the United States Army selected Sotera as one of the non-exclusive prime contractors for the Software and Systems Engineering Services Next Generation program ("SSES NexGen" or "NexGen" program) to provide warfighting software solutions and support to the Army at the Aberdeen Proving Ground in Maryland. NexGen was an IDIQ contract—an "indefinite delivery/indefinite quantity" contract. J.A. 668. A prime contractor has the right to bid on "Requests for Proposals" ("RFPs") or "task orders" issued by a federal department or agency under an IDIQ contract like NexGen. Sotera was qualified to bid on RFPs in the area of software and analytics. With a budgetary ceiling of $7 billion, the NexGen program was potentially very lucrative for contractors who were awarded work, but Sotera still had to out-bid other prime contractors to win a project under NexGen. Thus, the NexGen program was worth nothing to Sotera until it outbid other prime contractors for NexGen work.

In early October 2012, Haug and Vice President Kathleen Lossau asked Waag to become the Program Manager ("PM") of Sotera's NexGen work in light of Waag's experience managing IDIQ contracts. The PM position for an IDIQ contract is largely "a marketing business development role," J.A. 101-02, particularly in the early stages.

3

Thus, Waag's salary was not directly billable to the government—it was paid out of Sotera's overhead costs. During Waag's brief tenure as PM, Sotera did not have any work related to NexGen task orders, and Waag had no staff or employees reporting to him on NexGen projects.

On October 17, 2012, Waag severely injured his hand when he fell off the roof of his house. Waag was hospitalized for several days and then underwent two or three days of physical therapy per week. Waag's physician anticipated he would not return to work until December 31, 2012. Waag informed Haug about his injury on the day it happened and explained that he would not be able to work for an extended period of time due to the severity of the injury. During his absence from work, Waag was able to cover a portion of his salary by using Sotera's "paid time off" and short-term disability benefits. J.A. 121.

According to Waag, Sotera never notified him of his rights to take leave under FMLA. Sotera, however, gave its employees a handbook containing its leave policies, and this information was also accessible online. Sotera's leave policy provides up to 12 weeks of unpaid family and medical leave and states that, "with limited exceptions, an employee who takes leave under this policy will be able to return to the same job or a job with equivalent status, pay, benefits and other employment terms." J.A. 170.[1] When

---

[1] Under Sotera's FMLA policy, family and medical leave was unpaid unless the employee used a "paid time off" benefit to pay for some or all of the leave, depending on the circumstances.

4

Waag began his employment, he received a Kindle device onto which Sotera's leave and other human resources policies were loaded.

While he was on leave, Waag communicated with Sotera Vice-President Lossau about NexGen. In late October 2012, Waag indicated he was "severely limited in [his] ability to step out into the SSES NEXGEN [Project Manager] role." J.A. 256. After speaking with Waag and learning he would be out of work until mid-December or early January 2013, Lossau told Haug, "I need a new PM for SSES nexgen," and asked for Haug's input. J.A. 879. Shortly thereafter, Haug and Lossau decided to place Devin Edwards, who was Director of Mission Analytics and Collection, in charge of NexGen IDIQ work. Haug told Edwards there was "nothing to do" at the time Edwards took over because there were no pending task orders.

In early November, Waag and Lossau corresponded via e-mail regarding the NexGen PM position. Lossau explained that "Devin has agreed to be the SSES NexGen PM and will get things started for us" and asked Waag to "pass on any info [he had] to Devin." J.A. 240. Waag asked what his role in NexGen would be after he returned to work, noting that Lossau's e-mail "reads like Devin will be your full-time permanent SSES NEXGEN PM and not just a stop-gap measure until I am able to return." J.A. 239. Lossau responded that Waag should not "worry about [his] position" and that "[f]or the purposes of getting the team up and going with SSES NexGen we have to provide some stability [and] Devin is that stability for now." *Id.* Lossau encouraged Waag that "[a]ll will work out," and that "we will evaluate as we ease you back into full time work when you are ready . . . [T]ogether we [will] figure out what roles work best for all involved."

5

*Id.* But, she also told Waag that he had "been in the business long enough to know that no position is permanent." *Id.*

Shortly after Waag began his medical leave, federal budget sequestration went into effect, resulting in substantial cuts to federal spending. The effect of sequestration on defense contractors was significant since funding was not readily available for government contracts. One of the many programs delayed was NexGen. Lossau and Edwards attended the government's "kickoff meeting" for the NexGen contractors at which the contractors learned that "there was no funding available for the contracts." J.A. 251. In 2012 and 2013, there were no NexGen RFPs for which Sotera could submit a bid. During this period, the NexGen PM position was not a full-time job; Edwards estimated that he spent only ten to twenty percent of his time on his NexGen duties.

In late December 2012, Haug told Waag that when he returned to work, Waag would be reporting to a different supervisor, Jim Gerard, to help grow Sotera's new Electronic Warfare Program ("EWP") which involved modeling and simulation work. Unlike the NexGen program, which had no RFPs to bid on, the EWP unit was competing for a specific contract. Gerard was tasked with winning an EWP Management Trainer ("EWPMT") contract—"a 70 or 80 million dollar single award contract." J.A. 96. Because of Waag's experience in modeling and simulation, he was assigned to work on the EWPMT proposal, which was "a very complex pricing job." J.A. 141. Waag spent the majority of his time in January 2013 working on the EWPMT proposal, which was submitted in February 2013. The salary for Waag's new position was identical to the salary for the NexGen PM position he held before taking medical leave, and, as before,

6

Waag's salary was overhead as he was not performing billable work in the EWP. According to Lossau, Waag's new job "was an equivalent position" to the NexGen PM job and provided Waag "concrete work to perform." J.A. 252.

In late 2012, "Sotera and [its] DFA Business Unit saw a drastic decrease in work due to sequestration," J.A. 217, and Sotera missed its 2012 budget revenue goal "by $110 million," J.A. 219. In February 2013, Haug "was informed by senior management that [he] needed to cut [his division's] overhead cost by $2.3 million and that the only way to do that [was] to lay off employees." J.A. 219. Haug's DFA "business unit was especially under pressure because it had the highest indirect costs and was woefully underperforming on the revenue side." *Id.* In choosing which employees in his unit to lay off, Haug focused on employees who were not performing work directly billable to the government and "who were assigned to the less important strategic priorities." *Id.* Haug determined that the EWP and modeling and simulation groups were doing lower priority work than several other groups in the DFA division. Thus, Waag, an overhead employee not doing high priority work, was included in the initial group of employees laid off in February 2013. During 2013, fourteen senior managers were either laid off or resigned and were not replaced, and Waag's boss Gerard, a vice president, was laid off after Sotera failed to win the EWPMT contract. But Edwards, Waag's replacement for NexGen PM, was not among those laid off. Even though Sotera had no NexGen IDIQ work, Edwards was retained because he "was critical to a number of other significant revenue programs" and "was vital to the organization for reasons unrelated to NexGen." J.A. 220. Layoffs "continued throughout 2013 and 2014," and the DFA division

7

ultimately "was rolled into the company and no longer exists." J.A. 220. Finally, rather than be laid off himself, Haug resigned from Sotera in October 2014.

B.

Waag brought this action against Sotera in federal court, asserting that Sotera violated his FMLA rights (1) by failing to restore Waag "to the same position" after he returned from medical leave, J.A. 19, (2) by failing to restore him to "a bona fide equivalent position," and (3) by "terminating his employment," J.A. 20. Sotera moved for summary judgment, arguing that Waag "had no absolute right to reinstatement to the last exact job he was performing before his leave began" and that Waag's new job was equivalent to his pre-leave position because he "maintained his same salary and benefits[,] . . . still reported to a Vice President[,] . . . continued to work in a primarily business development role[,] . . . had more status than before [because] another Director [was] reporting to him . . . [and h]e worked in the same place." J.A. 24-25. Sotera disputed that Waag was terminated because he took leave, asserting that Waag's "employment would have been terminated . . . due to Sotera's poor financial condition" even if Waag had not taken leave. J.A. 25.

The district court granted Sotera's motion for summary judgment. First, the district court rejected Waag's argument that Sotera violated the FMLA by failing to restore him to his old job, concluding that the FMLA requires only that an employee returning from leave be restored "to *either* the same position *or* an equivalent position." J.A. 1139. Second, the district court concluded that "there is no genuine issue of material fact as to whether the tangible aspects of the EWP/M&S position to which plaintiff was

8

restored were equivalent to those of plaintiff's former position." J.A. 1140. The court observed that

> [i]n all material and significant respects, the two positions were the same: (i) both positions paid the same salary and benefits; (ii) both positions were senior director positions that required plaintiff to report to a vice president; (iii) neither position included significant managerial responsibilities; and (iv) in both positions, [Waag] was an indirect employee, whose work could not be billed directly to the government.

J.A. 1140-41 (internal citations and footnote omitted). And, "[m]ost important[]" to the district court, Waag's "primary responsibility in both positions was business development, a responsibility for which plaintiff was well-suited given his past experience." J.A. 1141. Finally, the court rejected Waag's claim that he was terminated in violation of the FMLA. The court addressed Waag's termination claim under two separate theories. First, the court rejected the argument that Sotera interfered with Waag's FMLA rights by terminating him rather than restoring him to at least an equivalent position because Waag would have lost his job even if he had not taken medical leave. Second, the district court rejected Waag's argument that he was terminated in retaliation for exercising his leave rights under the FMLA. Applying the burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), the district court assumed that Waag could make out a prima facie case of retaliation but concluded that Sotera established a legitimate non-discriminatory reason for terminating Waag: the "financial hardship" resulting from government sequestration forced Sotera to lay off numerous employees, of which Waag was one. J.A. 1148. Turning to whether Waag, in response, had shown that Sotera's non-discriminatory

9

reason was merely a pretext for FMLA retaliation, the district court concluded that the evidence "create[d] no genuine issue of material . . . fact [as to whether] defendant had an improper purpose in discharging plaintiff." *Id.*

Waag appeals, challenging each of the district court's conclusions. "We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *T–Mobile Ne. LLC v. City Council of Newport News*, 674 F.3d 380, 384–85 (4th Cir. 2012) (internal quotation marks omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

II.

In passing the FMLA, Congress sought "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, . . . to promote national interests in preserving family integrity," and "to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(1)-(2). Congress hoped to achieve these purposes "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3).

Under the FMLA, "an eligible employee" is "entitled to a total of 12 workweeks of leave during any 12–month period" for family- and health-related reasons. 29 U.S.C. § 2612(a)(1). An employee who takes leave under § 2612

10

shall be entitled, on return from such leave—

(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1). Furthermore, an employee who avails himself of FMLA leave "shall not" lose "any employment benefit accrued prior to the date on which the leave commenced." 29 U.S.C. § 2614(a)(2). On the other hand, an employee who has returned from such leave is not entitled to "any right, benefit, or position of employment" that the employee would not have been entitled to "had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B).

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). Claims for violations of the prescriptive rights set forth in § 2612 are "known as 'interference' or 'entitlement' claims." *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006).[2] Additionally, the FMLA "contains *proscriptive* provisions that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA." *Id.* The retaliation provision states that "[i]t shall be unlawful for any employer to discharge or in any other manner

---

[2] Section 2612 affords certain prescriptive rights to covered employees meaning that § 2612 "set[s] substantive floors for conduct by employers, and creat[es] entitlements for employees." *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006) (internal quotation marks and alteration omitted),

discriminate against any individual for opposing any practice made unlawful by this title." 29 U.S.C. § 2615(a)(2).

## III.

### A.

Waag first argues that Sotera interfered with his FMLA rights by failing to restore Waag after he returned from leave "to his former position with the company even though the position was still available." Brief of Appellant at 2. As is clear from its plain language, however, the FMLA does not require an employer to restore an employee returning from leave to his previous position *no matter what*. The FMLA provides that an eligible employee "shall be entitled, on return from such leave—(A) to be restored . . . to the position of employment held by the employee when the leave commenced; *or* (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1) (emphasis added). Congress provided restoration rights in the disjunctive, meaning that restoration of a covered employee to either position—the employee's original job or a different job that is "equivalent" within the meaning of the statute—will suffice to satisfy § 2614(a)(1). The text has a plain and unambiguous meaning—that an employee who takes FMLA leave has the right to be restored *either* to his original position *or* to an equivalent position. Furthermore, the restoration provision does not indicate a preference for restoring covered employees to their pre-leave positions over "equivalent" positions, and it does not require an employer to hold open an employee's original position while that employee is on leave. Waag would have us rewrite the FMLA by adopting his preferred

12

reading of the text. Although Congress is free to revise the statute so that an employer can restore an employee to an equivalent position only if the employee's original job no longer exists, this court is not empowered to do so.

We reject Waag's reliance on 29 C.F.R. § 825.214 to support his reading of § 2614(a)(1). The regulation provides:

> General rule. On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. An employee is entitled to *such reinstatement* even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence.

29 C.F.R. § 825.214 (emphasis added). Waag reads this language to mean that "it is not a valid defense to an FMLA claim" for the employer to refuse to restore the returning employee "because [the employer] needed to hire someone to fill [the employee's] position" while the employee was on leave. Brief of Appellant at 45. This regulation does not aid Waag. The phrase "such reinstatement" refers to the reinstatement mentioned in the previous sentence of the regulation—reinstatement "to the same position the employee held when leave commenced," *or* reinstatement "to an equivalent position." 29 C.F.R. § 825.214. The language of the regulation is perfectly consistent with the statute, clarifying that an employee returning from FMLA leave may be restored to an equivalent position even if the employee has been replaced in his original position. Waag offers no other authority to support his position. Of course, given the clarity of the

13

statute on this particular point, it is not surprising that this court has not previously addressed this issue in a published opinion.[3]

Pursuant to the plain terms of § 2614(a)(1), Sotera had the option of placing Waag in a job equivalent to his original, pre-leave job. Waag did not have an absolute right to return to his original position. Thus, we conclude the district court correctly rejected Waag's legal contention that Sotera interfered with his FMLA rights by not restoring him to his pre-leave position.

## B.

Waag next argues that Sotera interfered with his FMLA rights by failing to restore him "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(B). "An equivalent position" means "one that is virtually identical to the employee's former position," not only with respect to pay and benefits, but also "working conditions, including privileges, perquisites and status." 29 C.F.R. § 825.215(a). The new position "must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." *Id.*; *see Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 723 (4th Cir. 2013). The equivalency requirement, however, "does not

---

[3] In an unpublished decision, a panel of this court stated that "[t]he FMLA allows an employee who takes qualifying leave to be restored *either* to his original, pre-leave position *or* to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Csicsmann v. Sallada*, 211 F. App'x 163, 166 (4th Cir. 2006) (per curiam) (emphasis added; internal quotation marks omitted).

14

extend to de minimis, intangible, or unmeasurable aspects of the job." 29 C.F.R. § 825.215(f).

The district court concluded that there was no genuine issue of material fact regarding "whether the tangible aspects of the EWP/M&S position to which [Waag] was restored were equivalent to those of [Waag's] former position," finding that "[i]n all material and significant respects, the two positions were the same." J.A. 1140. It is undisputed that Waag's salary was identical for both jobs—$189,000—and that Waag was eligible for bonuses in both positions. *See* 29 C.F.R. § 825.215(c)(2) & (e)(3). The employment benefits were exactly the same for both positions. For example, Waag enjoyed full health benefits both before and after his medical leave. *See* 29 C.F.R. § 825.215(d) ("Equivalent benefits" means "all benefits provided or made available to employees by an employer, including group life insurance, health insurance, disability insurance, sick leave, annual leave, educational benefits, and pensions.").

Moreover, the "terms and conditions of employment" were equivalent for both jobs. Waag's worksite was the same before and after leave. *See* 29 C.F.R. § 825.215(e)(1) ("The employee must be reinstated to the same or a geographically proximate worksite"). Waag's title—Senior Director—stayed the same in his new position, and he reported to a Sotera Vice President, just as he had before taking leave. And, his duties and responsibilities in the EWP position were "substantially similar" to those attached to his original position. 29 C.F.R. § 825.215(e). Waag focused on business development for most of his time at Sotera, both before and after taking medical leave. Prior to the Sotera-Potomac Fusion merger, Waag's primary duties included

15

business development for the modeling and simulation side of the business.  Likewise, during Waag's short stint as NexGen PM, business development was a major focus for him.  According to Waag himself, the project manager of an IDIQ contract has a few critical responsibilities, "but the big one is . . . marketing business development," J.A. 101, in light of the fact that "[w]hen you're managing an IDIQ contract, . . . you don't have any clients yet," and "you don't have any funding yet," J.A. 100.  The project manager must "win task orders," which requires "cultivating relationships with customers."  J.A. 100-01.

Waag nonetheless argues that his pre-leave job was very much unlike the EWP position he was restored to after leave.  Primarily, Waag asserts that as NexGen PM, he was responsible for preparing and responding to RFPs, a decidedly non-business-development function.  In support, Waag points to a 47-item Action Item List that he created shortly after being named NexGen PM.  The list describes duties relating to the management of proposals for NexGen task orders and the performance of NexGen task orders.  Waag contends that this list reflects numerous duties that are not related to business development.  In large part, however, these duties were conditional—Waag would have performed them only after Sotera had successfully bid for a NexGen task order.  But, because the government did not award any NexGen task orders until early 2014, these were not duties that Waag was performing before taking medical leave or could have performed after returning from leave.  We cannot agree that Waag's personal to-do list creates a question of fact as to whether or not Waag, as NexGen PM, was tasked in large part with business development.

16

Waag highlights numerous other differences between the two jobs. For example, he contends that the two positions were not equivalent because he was a member of the business unit's "core management" group prior to, but not after, his medical leave. Brief of Appellant at 48. Waag, however, fails to explain the purpose and function of this group or how the tangible or measurable aspects of his employment were affected by exclusion from this group. To the extent Waag complains about a loss of prestige, such a difference is de minimis and would not prevent Waag's post-leave position from being considered equivalent to his original one. *See* 29 C.F.R. § 825.215(f).

Waag also complains that his new EWP position "had no billable work . . . [or] pipeline of task orders" attached to it, and that he "no longer had any responsibility or authority to manage contracts, employees, or revenue." Brief of Appellant at 30-31. Such circumstances, however, do not distinguish the EWP and NexGen positions. Before Waag took leave, and for a substantial period after he returned, the NexGen PM likewise had no pipeline of task orders, no billable work, and no employees to manage. Therefore, as Waag himself recognized, initially one of the most critical duties of an IDIQ PM is "business development." J.A. 101.

In our view, no reasonable factfinder could conclude that Sotera failed to place Waag in "an equivalent position" or that the differences between the two jobs were more than merely de minimis. 29 U.S.C. § 2614(a)(1)(B). We therefore affirm the district court's grant of summary judgment to Sotera with respect to Waag's claim that Sotera interfered with his FMLA rights by failing to restore him to an equivalent position.

17

IV.

Finally, Waag challenges the dismissal of two claims based on his termination from Sotera. First, Waag argues that Sotera interfered with his FMLA rights by terminating him a little more than one month after his return from medical leave. *See* 29 U.S.C. § 2615(a)(1). Second, Waag contends that Sotera terminated him in retaliation for exercising his rights under the FMLA to take medical leave. *See* 29 U.S.C. § 2615(a)(2); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016) (delineating the elements of a retaliation claim under § 2615(a)(2)). The district court concluded that Waag failed to create a genuine issue of material fact as to either claim.[4] Waag contends both conclusions were erroneous.

A.

Waag claims that Sotera did not restore him to a real position. Rather, Waag believes that his post-leave job associated with the EWP was, in fact, a sham position,

---

[4] Waag's complaint only asserted the termination claim as "an independent theory of FMLA interference." J.A. 1144. In response to Sotera's summary judgment motion, Waag offered evidence in support of a retaliation theory, and filed a Rule 15 motion for leave to amend the complaint to add a retaliation claim. Because the district court concluded that summary judgment was also appropriate as to the retaliation claim, the court denied the motion to amend as "both unnecessary and futile." J.A. 1149. The district court was well within its considerable discretion in denying Waag's motion to amend. We therefore reject Waag's challenge to this ruling. *See Steinburg v. Chesterfield Cnty. Planning Comm'n*, 527 F.3d 377, 390-91 (4th Cir. 2008) (finding no abuse of discretion in denial of motion to amend where amendment was futile).

We likewise conclude that the district court did not abuse its discretion in denying Waag's motion to amend the witness list and the trial exhibit list as moot. Thus, we reject Waag's challenge to this ruling as well.

created to make it appear that Waag had been restored to an equivalent position but that, in actuality, was slated for elimination. Basically, Waag thinks Sotera decided to fire him while he was on leave and then did so by placing him in a make-work job after he returned. The district court rejected this argument, concluding that Waag would have been discharged regardless of whether or not he had taken leave. The district court noted that Waag's termination was inevitable in light of Sotera's dire financial circumstances as a result of sequestration, the lack of work under the NexGen contract, and Waag's status as an indirect employee paid out of overhead.

On appeal, Waag contends that summary judgment was inappropriate because a triable question of fact exists as to whether his post-leave position was a sham, essentially scheduled to be eliminated after a few weeks. Waag relies on an FMLA regulation that fleshes out the limitations on the right to reinstatement recognized in the statute. *See* 29 U.S.C. § 2614(a)(3); 29 C.F.R. § 825.216(a). The regulation provides, in relevant part, that "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period," meaning that an employer may *deny restoration completely* if the employer "show[s] that an employee would not otherwise have been employed at the time reinstatement is requested." 29 C.F.R. § 825.216(a). However, "[r]estoration to a job slated for lay-off when the employee's original position is not would not meet the requirements of an equivalent position." 29 C.F.R. § 825.216(a)(1). Waag suggests that there is sufficient record evidence for a jury to conclude that (1) after he returned from leave, Waag was put in a "sham" job that was essentially slated for elimination, and (2)

19

that Waag would not have been laid off if he had not taken leave because his original job was never eliminated, as demonstrated by the fact that Edwards continued to serve as NexGen PM until October 2015. Were both of these assertions true, then Sotera's placement of Waag in the EWP job "would not meet the requirements of an equivalent position." 29 C.F.R. § 825.216(a)(1).

We conclude, however, that no reasonable juror would believe, based on this record, that Waag was put in a short-term sham job to cover Sotera's decision to fire Waag when he returned from leave. Waag argues that a jury could conclude that the job Sotera gave Waag following medical leave "was a fake or sham position" based largely on "temporal proximity"—that is, he was placed in a new business development job that was eliminated approximately six weeks later. Brief of Appellant at 49-50. Waag points out that obtaining government contract work involves a protracted bidding process, and he argues that his business development position was eliminated well before he had a chance to generate any revenue. Waag, however, points to no actual evidence in the record that would permit a jury to conclude—*without speculating*—that the EWP job was a sham. The undisputed evidence shows that Waag's position was genuine and that it was not slated for lay-offs at the time that Waag returned from leave. Vice President Gerard was assigned to the EWP, which, at the time Waag joined, was working toward winning an EWPMT contract worth "70 or 80 million dollar[s]." J.A. 96. Indeed, Waag worked on the proposal as well. Although Sotera's bid was ultimately unsuccessful, it was a real bid. And if it was a sham, it was an elaborate one that affected other people— Gerard, a vice president, also lost his job following the failed bid. Accordingly, we

20

affirm the district court's conclusion that Sotera was entitled to summary judgment on Waag's claim that Sotera interfered with his FMLA rights by reinstating him to a sham position and then firing him at the first opportunity.[5]

B.

Waag contends that Sotera terminated him in retaliation for exercising his rights under the FMLA to take medical leave in violation of 29 U.S.C. § 2615(a)(2), which makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." To establish a prima facie retaliation claim under the FMLA, the plaintiff must demonstrate "that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity." *Sharif*, 841 F.3d at 203 (internal quotation marks omitted).

---

[5] Waag floats another interference argument based on the FMLA's "key employee" exemption, *see* 29 C.F.R. § 825.217(a), which permits an employer to deny restoration completely if "such denial is necessary to prevent substantial and grievous economic injury to the operations of the employer." 29 U.S.C. § 2614(b)(1)(A). An employer who intends to invoke this provision must notify the employee "[a]s soon as [the] employer makes a good faith determination, based on the facts available, that substantial and grievous economic injury to its operations will result if a key employee who . . . is using FMLA leave is reinstated." 29 C.F.R. § 825.219(b). Waag figures that Sotera is seeking the benefits of this provision without identifying him as a key employee or complying with the notice provision.

This provision does not apply here, Sotera has never claimed that it could not restore Waag to his position or an equivalent position because his reinstatement would cause "substantial and grievous economic injury to [its] operations." 29 U.S.C. § 2614(b)(1). Sotera has never taken the position that it could completely deny restoration to Waag. Indeed, Sotera placed Waag in an equivalent position, as we explained previously. This argument is a non-starter.

Significantly, "[u]nlike prescriptive entitlement or interference claims, employer intent here is relevant." *Id.* If the plaintiff can produce no direct evidence of intent, he can demonstrate intent by circumstantial evidence, which we evaluate under the framework established for Title VII cases in *McDonnell Douglas*; *see Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016) (applying *McDonnell Douglas* to FMLA retaliation claim). Under this framework, the plaintiff must establish the elements of a prima facie FMLA retaliation claim set forth above. *See Sharif*, 841 F.3d at 203. If the plaintiff produces sufficient evidence to establish a prima facie case, then a presumption of retaliation arises and the "burden of production then shifts to the employer to rebut the . . . presumption of retaliation and provide [a] legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (internal quotation marks omitted). If the employer rebuts the presumption of retaliation, then "the plaintiff resumes the burden of persuading the factfinder that the employer's proffered explanation is merely a pretext for [retaliation]," which the plaintiff can do "by showing either that the employer's explanation is not credible, or that the employer's decision was more likely the result of retaliation." *Id.* Accordingly, to survive summary judgment on an FMLA retaliation claim, "the plaintiff must produce sufficient evidence to create a genuine dispute of material fact such that a reasonable factfinder could conclude the adverse employment action was taken for an impermissible reason, i.e., retaliation." *Id.*

Waag argues that he established a prima facie case of retaliation by showing close temporal proximity between the protected activity at issue—medical leave—and his employer's adverse action—termination from employment less than six weeks after

22

Waag returned from leave. We agree that, for purposes of establishing a prima facie case, close temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation. *See Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogation on other grounds recognized by Foster v. Univ. of Md—E. Shore*, 787 F.3d 243, 299 (4th Cir. 2015). But, even assuming that Waag established a prima facie case of retaliation under the FMLA, he still "bears the burden of establishing that [Sotera's] proffered explanation is pretext for FMLA retaliation." *Yashenko*, 446 F.3d at 551 (internal quotation marks omitted). Sotera offered evidence that government sequestration in October 2012 had a disastrous effect on the defense contracting industry, cutting federal spending on programs such as NexGen. Sotera missed its projected revenue for 2012 by $110 million and determined that drastic cuts in spending were required. In February 2013, Sotera decided that the DFA division, which had high overhead and was underperforming in terms of revenue, needed to cut costs by $2.3 million. To effectuate these drastic cuts, the DFA division began laying off employees in February 2013 and continued throughout 2014. Haug focused initially on employees who were not performing important strategic work that could be billed directly to the government, and thus Waag was among the first employees included in the layoffs.

Waag appears to contend that Sotera's budgetary reduction-in-force explanation is pretextual on a few different bases.[6] First, Waag suggests that Sotera has exaggerated the effect of sequestration and that the idea of Sotera's budgetary crisis was overblown, pointing to an FAQ page created by Sotera to answer questions about sequestration. In particular, Sotera indicated its "leadership team . . . deliberately positioned the company in the right spaces over the past few years to inoculate ourselves from the inevitable return to 'peacetime' defense spending levels." J.A. 801. Obviously, such language in no way refutes the substantial evidence proffered by Sotera. Moreover, the same FAQ page warned that "[t]he sequester will reduce 2013 discretionary spending . . . [by] approximately $85.4 billion," and that "Sotera will likely be impacted." J.A. 801. Second, Waag contends that another indication that Sotera's reason was pretextual is the fact that Sotera never produced a contemporaneous RIF list. But this is demonstrably untrue, as the record contains a list of employees included in the layoffs created for a March 2013 "senior leadership meeting." J.A. 972. Third, Waag presents an October 2012 email from Lossau to Haug as evidence of discriminatory intent to fire him because he took leave:

I spoke with Gary tonight.

---

[6] In the section of his brief specifically challenging the dismissal of his retaliation claim, Waag does not dispute Sotera's non-retaliatory explanation that Waag was laid off as part of a reduction in force caused by a budgetary crisis. In other portions of his brief, however, Waag randomly raises challenges that would be relevant to the argument that Sotera's explanation was pretextual.

24

He will be on short term disability until mid dec (earliest) and January more likely.

I need a new PM for SSES nexgen. . . . Thoughts?

J.A. 879. As the district court stated, "no reasonable juror could interpret this email as indicating that defendant had already decided that plaintiff would be discharged," J.A. at 1148, especially in light of Lossau's emails to Waag making clear that she needed someone to assume the role of NexGen PM since the program was in its initial stages. Indeed, if anything, Lossau's email recognizes that Waag would be returning to work in December or January. Finally, Waag argues that "Sotera's claim about the need to save money (and thus, the company had to RIF [him]) makes no rational sense because Sotera paid Devin Edwards more than [him]" and Edwards was not terminated. Brief of Appellant at 25. The retention of Edwards, however, does not show pretext since Edwards did not fit the criteria for the initial layoffs. Unlike Waag, Edwards was responsible for numerous additional contracts and projects, including some work that was directly billable to the government.[7]

Accordingly, we conclude that Waag failed to adduce sufficient evidence to create a genuine issue of material fact "such that a reasonable factfinder could conclude the

---

[7] Waag also argues that, with respect to his retaliation claim, "Sotera has the burden of production . . . that in the absence of taking FMLA leave Waag would have been removed from his Program Manager position in December 2012 and subsequently discharged in February 2013." Brief of Appellant at 52. This might have been true if Sotera had discharged Waag while he was on leave. *See Yashenko*, 446 F.3d at 545, 548. But, as we have already explained, Sotera restored Waag to an equivalent position when he returned from leave. Sotera only had the burden of rebutting Waag's prima facie case, which it did by offering evidence of a non-discriminatory reason for laying off Waag.

adverse employment action was taken for an impermissible reason, i.e., retaliation." *Sharif*, 841 F.3d at 203.

V.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Sotera as to each of Waag's claims under the FMLA.

AFFIRMED